ANGEL & FRANKEL, P.C.
Attorneys for Debtors
460 Park Avenue
New York, New York 10022-1906
(212) 752-8000
Joshua J. Angel, Esq. (JA-3288)
Jeffrey K. Cymbler, Esq. (JC-3261)
Craig R. Nussbaum, Esq. (CN-8742)
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                          Chapter 11

HORSEHEAD INDUSTRIES, INC., *et al.,*           Case Nos.  02-14024 (SMB) through
                                                           02-14027 (SMB)
                                    Debtors.
                                                Jointly Administered

--------------------------------------------------------x

**DEBTORS' RENEWED MOTION FOR AN ORDER:  SHORTENING
TIME, LIMITING NOTICE, AND FIXING DATES, TIMES AND PLACE
OF HEARINGS ON AN EXPEDITED BASIS TO CONSIDER ENTRY OF
FURTHER ORDERS PURSUANT TO SECTIONS 102, 105(a), 363(b),
363(f), 363(m), 363(n), 365 AND 1146(c) OF THE BANKRUPTCY CODE
AND FED. R. BANKR. P. 2002(a)(2), 9006(c), 9007, 6004 AND 6006: (1)
AUTHORIZING THE SALE BY THE DEBTORS AND CERTAIN OF
THEIR NON-DEBTOR SUBSIDIARIES OF CERTAIN OF THEIR
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, (2) FIXING THE DATES, TIMES AND PLACES OF
AN AUCTION AND SALE HEARING AND AUTHORIZING THE
DEBTORS TO CONDUCT AN AUCTION TO SELL SUCH ASSETS, (3)
AUTHORIZING THE DEBTORS TO SELL SUCH ASSETS TO
HORSEHEAD ACQUISITION CORP. OR ANY HIGHER AND BETTER
BIDDER PURSUANT TO THE TERMS OF AN ASSET PURCHASE
AGREEMENT, (4) APPROVING A BREAK-UP FEE (5) AUTHORIZING
DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN
ASSUMED EXECUTORY CONTRACTS AND ASSUMED LEASES (6)
APPROVING THE FORM, MANNER AND EXTENT OF NOTICE OF
SUCH AUCTION AND HEARINGS  AND
(7) GRANTING RELATED RELIEF
(A&F # 062)**

TO THE HONORABLE STUART M. BERNSTEIN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Horsehead Industries, Inc. d/b/a Zinc Corporation of America ("Horsehead"), Horsehead Resource Development Company, Inc. ("HRD"), ZCA Mines, Inc. ("Mines"), and Stoney Ridge Materials, Inc. ("Stoney Ridge", together with Horsehead, HRD and Mines, the "Debtors") debtors and debtors-in-possession in the above captioned Chapter 11 cases, by their counsel, Angel & Frankel, P.C., hereby move this Court to renew their previously filed motion, dated May 28, 2003 (the "Motion"), for entry of an order, substantially in the form annexed hereto as Exhibit "A" (the "Scheduling Order"), which, *inter alia*: (a) schedules a hearing (the "Sale Hearing") on an expedited basis to consider approval of the sale by the Debtors and certain of their non-debtor subsidiaries of certain of their assets to Horsehead Acquisition Corp. ("Acquisition") free and clear of all liens, claims and encumbrances (collectively, "Liens"), substantially in accordance with the terms of an Asset Purchase Agreement between the Debtors and certain of their subsidiaries party thereto (collectively, the "Sellers") and Acquisition, as buyer (the "Agreement")[1], or any higher and better third party bidder, in accordance with 11 U.S.C. §§ 105(a), 363(b), (f), (m) and (n) and 1146(c) (and authorizing the Debtors to assume and assign certain executory contracts and unexpired leases (the "Assumed Executory Contracts and Assumed Leases"), a list of which is annexed hereto as Exhibit "B"[2] pursuant to 11 U.S.C. § 365), all as more fully set forth below; (b) schedules a preliminary hearing on an expedited basis to be held prior to the auction and the Sale Hearing (the "Procedures Hearing") to consider entry of an order substantially in the form of Exhibit "C" annexed hereto (the "Procedures Order") scheduling an auction (the "Auction"), approving the terms and conditions for submitting higher

---

[1]    The Agreement will be supplied to the Court prior to the Procedures Hearing.

[2]    Due to the voluminous nature of the Assumed Executory Contracts  and Assumed Leases, they are not included herein and will be provided promptly upon written request to the undersigned.

and better offers for the Purchased Assets (as defined below), including approval of a breakup fee and certain bidding procedures; (c) approving the form, manner and extent of the notice of this renewed Motion, the Procedures Order, the Procedures Hearing, the Auction and the Sale Hearing; and (d) granting related relief.

**AN EXPEDITED HEARING TO APPROVE THE PROPOSED BREAK UP FEE AND SALE PROCEDURES AND TO SCHEDULE AN AUCTION AND SALE HEARING IS URGENTLY NEEDED**

1.      The Debtors previously filed a motion, dated May 28, 2003, for an order authorizing the sale of substantially all of their assets to Acquisition (the "Original Sale Motion").

2.      Unfortunately, the Debtors, the lenders and financial institutions party to the Revolving Credit and Guaranty Agreement dated as of December 27, 2000 among the Lenders and JPMorgan Chase Bank, as administrative agent (the "Bank Group"), the official committee of unsecured creditors (the "Creditors Committee"), Viacom International, Inc. ("Viacom") and Teachers Insurance and Annuity Association of America ("Teachers") (collectively, the "Interested Parties") were not able to achieve a final agreement with Acquisition with regard to certain issues regarding the proposed sale.  Accordingly, on July 2, 2003, at the request of the Bank Group and the Creditors' Committee, the Debtors filed a Notice of Withdrawal of the Original Sale Motion on July 2, 2003 (the "Acquisition Withdrawal"), a copy of which is annexed hereto as Exhibit "D".  The Acquisition Withdrawal specifically withdrew the Original Sale Motion "without prejudice and subject to the restoration of the sale motion".

3.      Subsequent to the Acquisition Withdrawal, continued negotiations between the Debtors and other potential buyers resulted in the negotiation and execution of a new asset purchase agreement, dated July 30, 2003, between North American Zinc Corporation ("NAZC")

and the Debtors for the purchase of certain of the Debtors' assets. A motion for an order authorizing the sale of certain of the Debtors' assets to NAZC was filed on July 30, 2003.

4. Once again, the Debtors and the Interested Parties were unable to achieve a final agreement with NAZC with regard to certain issues surrounding the proposed sale. Accordingly, on August 25, 2003, the Debtors filed a Notice of Withdrawal of the NAZC sale motion (the "NAZC Withdrawal").

5. Since they filed the NAZC Withdrawal, the Debtors and the Interested Parties have worked feverishly, in what was essentially a non-judicial auction, in an attempt to identify the highest and best offer for the sale of substantially all of the Debtors' assets. These efforts have resulted in a consensual agreement by the Debtors and each of the Interested Parties that a revised sale transaction put forth by Acquisition, as set forth in the Agreement, should be put forward as the "stalking horse" bid for the sale of the Purchased Assets.

6. The circumstances of these cases require an expedited Procedures Hearing. First, due to the occurrence an continuance of ongoing events of default under the post-petition Revolving Credit and Guaranty Agreement, dated as of December 27, 2002 (the "DIP Credit Agreement"), the Debtors have been unable to fully access the revolving credit agreement to fund their working capital needs. Second, as testimony to be proffered by the Debtors will show, the Debtors are at a critical stage in their business operations with their customers, suppliers, vendors and employees. Because of the extended sale process which has befallen the Debtors, the confidence and support that they have been receiving from their customers, suppliers, vendors and employees has dwindled considerably over the past few months. If a sale of the Debtors' business as a going concern cannot be achieved within the next few weeks, the value of the Debtors' business as a going concern will be dramatically decreased. As such, the Debtors

request that the Procedures Hearing be held no later than **November 18, 2003** and the Sale Hearing be held no later than **November 26, 2003**.

## INTRODUCTION

7.      On August 19, 2002 (the "Filing Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court and an order for relief under section 301 of the Bankruptcy Code was entered in their cases (the "Chapter 11 Cases").

8.      The Debtors have been authorized to remain in possession of their property and to continue in the operation and management of their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      Neither an examiner nor a trustee has been appointed in the Chapter 11 Cases. The Creditors' Committee which has been appointed by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), has retained the law firm of Blank Rome, LLP as its counsel.

10.      By order dated August 19, 2003, the Court authorized the joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

11.      Horsehead, the lead Debtor, owns 100% of the equity of HRD and Mines.  HRD owns 100% of the equity of Stoney Ridge.

12.      Horsehead, with its subsidiaries, is the largest zinc producer in the United States. It operates a zinc refinery in Monaca, Pennsylvania, with the capacity to produce up to 180,000 tons of zinc per year.  Contiguous to the Monaca refinery is a fully integrated 110 megawatt electrical power plant which provides power to the refinery and which produces excess

electricity for sale to third parties. Its HRD subsidiary operates recycling facilities, which accept and process hazardous zinc wastes, in Palmerton, Pennsylvania, Rockwood, Tennessee, Calumet, Illinois, and Beaumont, Texas. Horsehead's corporate headquarters are located in New York, and with its subsidiaries, it employs over 1,000 individuals. For its last fiscal year it had revenue in excess of $200 million.

13. Horsehead is a unique manufacturer and producer of zinc metal, zinc powders and zinc oxides and its operations would be extremely difficult to replicate. What distinguishes Horsehead from its competitors is its extensive use of recycled zinc feedstock to produce its end products. It is the world leader in recycling inorganic zinc bearing material (including an EPA designated hazardous waste called "EAF Dust"). Its proprietary technology for recycling EAF Dust has been designated by the United States Environmental Protection Agency as representing the "Best Demonstrated Available Technology" and without its continuous operations there would be no ready repository for much of this hazardous waste generated in the United States.

14. A brief description of how Horsehead operates better explains how it distinguishes itself from its competitors and how it occupies a central role in the domestic United States steel industry. Currently more than 50% of the steel produced in the United States is produced by steel "mini mills" which rely heavily on recycled steel for their feedstock. Much of this recycled feedstock consists of "galvanized" steel, that is steel coated with zinc to prevent corrosion and to retard oxidation. A by-product of the mini mill steel production process is a listed hazardous waste material called "electric arc furnace" ("EAF") dust which has a substantial zinc content. Horsehead has contracts with more than fifty steel companies who pay it a fee to accept and process their EAF Dust. Without Horsehead to recycle their EAF Dust, the mill operators' primary alternative would be to dispose of this waste material in a limited number

of hazardous waste landfills specifically designated to accept EAF Dust. Because hazardous waste landfill capacity in the United States is limited, they would not be able to handle the volume of EAF Dust produced in this country. Thus, it is essential to the steel industry that Horsehead continue its important role as a recycler of hazardous waste which are a by product of the mini mills.

15. Using its proprietary technology, HRD extracts substantial quantities of crude zinc oxide from the EAF Dust. It then delivers the crude zinc oxide to Horsehead's smelter in Monaca, Pennsylvania, where it is used as a primary raw material to produce zinc metal, zinc oxides and other value added zinc products for sale to customers. Approximately 55% of the zinc feedstock used in the Monaca facility comes from the zinc recovered from EAF Dust. Most of the remaining feedstock comes from secondary zinc sources, *i.e.*, recycled zinc much of which Horsehead repurchases from its customers. Horsehead has now discontinued the use of zinc concentrates (which is produced from virgin ore) as a feedstock at its Monaca facility.

16. Despite what it believes to be its proprietary technology, its substantial competitive advantages and its unique position in the zinc industry, like all zinc producers, Horsehead has suffered from a worldwide decline in the market price of zinc. Indeed, the price of zinc as quoted on the London Metals Exchange at around the Filing Date reached a low of approximately $.34 a pound. To understand how depressed the price is, the Debtors have determined that on an inflation adjusted basis, this is the lowest price for zinc in over 100 years. Although the Debtors have experienced an improvement in pricing since the Filing Date (i.e. to approximately $.42 a pound), the improvement is below expectation and need as world wide industry capacity continues to outstrip demand and the Debtors continue to bleed cash and operate unprofitably.

## JURISDICTION

17.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are §§ 102, 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Rules 2002, 6004, 6006, 9006 and 9007 of the Bankruptcy Rules.

## SUMMARY OF RELIEF REQUESTED

18.     By this Motion, the Debtors initially seek the entry of the Scheduling Order annexed hereto as Exhibit "A" which would establish expedited hearing dates and notice procedures for such hearings, at which hearings the Debtors will request entry of the following orders:

>       (a)     a Procedures Order, substantially in the form annexed hereto as Exhibit "C"; *inter alia*:

>>              (i)     approving the terms, conditions and procedures for the sale by the Debtors of certain of their assets (and authorizing the Debtors to assume and assign certain related Assumed   Executory Contracts and Assumed Leases) (collectively, the "Acquired Assets") to Acquisition or to any party making a higher or better offer as more fully set forth below, pursuant to sections 105(a), 363(b), (f), (m) and (n), 365 and 1146(c) of the Bankruptcy Code, free and clear of any and all Liens except as provided

in the Agreement, with any Liens, attaching solely to the consideration paid for the Acquired Assets;

(ii)     approving the breakup fee and bidding procedures contained in the Agreement; and

(iii)     approving the manner and extent of the notice of the Procedures Order, the Auction, the Sale Hearing and the assumption and assignment of the Assumed Executory Contracts and Assumed Leases and the cure amounts related thereto;

(b)     *inter alia*, approving the sale of the Acquired Assets free and clear of all Liens except as provided in the Agreement to either (i) Acquisition under the Agreement; or (ii) a competing bidder whose bid for the Acquired Assets is the highest and best bid, consistent with terms of the Bid Procedures;

(c)     authorizing the Debtors to assume and assign the Assumed Executory Contracts and the Assumed Leases and fixing the cure amounts relating thereto; and

(d)     authorizing the exemption of transfer, stamp or similar taxes pursuant to 11 U.S.C. § 1146(c).

19.     As stated previously, the Debtors seek the entry of the Scheduling Order, *inter alia*: a) scheduling the Procedures Hearing to consider the Procedures Order no later than **November 18, 2003**; and b) scheduling the Sale Hearing to consider approval of the sale of the Acquired Assets no later than **November 26, 2003**.  As further discussed below, the Debtors

submit that the sale of the Acquired Assets is necessary in order to maximize the value of the Acquired Assets and, thus, serves the best interests of the Debtors' estates and creditors.

## NEED FOR AN IMMEDIATE SALE

20.     The current circumstances in which the Debtors find themselves have mandated the immediate sale of substantially all of their assets in order to preserve the value of their bankruptcy estates for the benefit of their creditors.  A sale is immediately necessary at this time because the Debtors do not have sufficient financial liquidity or resources to continue operations. During the first eight (8) months of 2003, the Debtors have had average net operating losses of approximately $2,411,500 per month.  The Debtors' lack sufficient funding to finance operations until their operations achieve positive cash flow.  It is also likely that if the Debtors do not move forward with a sale of their assets, the Debtors will be forced to cease their business operations.

21.     In September 2002 the Debtors agreed to retain The Blackstone Group ("Blackstone") as their financial advisor to assist them in formulating a plan, and/or marketing their assets.  Blackstone initially helped the Debtors develop a five year business plan and thereafter solicited nearly one hundred potential investors and acquirors (financial and strategic) for offers to either fund a reorganization plan or acquire the Debtors' operating assets.

22.     The best offer which initially emerged was from Acquisition.  Unfortunately, the Debtors and the Interested Parties were not able to achieve a final agreement with Acquisition with regard to the Bid Procedures and certain other issues regarding the proposed sale, resulting in the Debtors' filing the Acquisition Withdrawal of the Original Sale Motion.  A second offer from NAZC reached an impasse as well, as the constituencies were again unable to achieve a final agreement with regard to Bid Procedures and certain other issues regarding the sale, resulting in the NAZC Withdrawal.

23.     The Debtors with the assistance of their advisors sought out additional offers. Extensive negotiations between the Debtors, the Interested Parties and potential purchasers resulted in a revised offer from Acquisition, it being the best which emerged from the negotiations.

## PURCHASE AGREEMENT

24.     The Debtors and Acquisition have engaged in extensive good faith negotiations which have resulted in the execution of the Agreement. The following summarizes the salient provisions of the Agreement:[3]

25.     **Acquired Assets.** The Sellers shall sell, assign, and transfer to Acquisition free and clear of any and all Liens except as provided in the Agreement, and Acquisition shall purchase from the Sellers, all right, title and interest of every kind and nature in and to all assets owned or leased by the Sellers as of the closing date including, without limitation, all of the following assets:

(i)      all cash and marketable and other securities;

(ii)     all accounts receivable other than the excluded accounts receivable;

(iii)    all promotional allowances and vendor rebates and similar items;

(iv)     all tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the closing date, subject to any offsets by any Governmental Authority;

---

[3]     The description of the terms of the Agreement set forth in this Motion is for purposes of highlighting certain provisions contained in the Agreement. The Debtors respectfully refer the Court and all parties in interest to the Agreement which is attached hereto as Exhibit "B" for the full terms and conditions of the Agreement between the parties. The description of the Agreement herein is qualified in its entirety by the Agreement itself. If any of the terms described herein conflict with any of the terms in the Agreement, the terms of the Agreement shall control. Terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

(v)     all intellectual property owned by, issued to or licensed to any of the Debtors or their affiliates or any other Seller which relates to and/or is used in the ordinary course of business or in connection with the business, together with all income, royalties, damages and payments due or payable to the Debtors as of the closing or thereafter, the right to sue and recover for past infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments thereof;

(vi)    all of the Sellers' rights existing under the Assumed  Executory Contracts;

(vii)   all bank accounts, collection accounts, safety deposit boxes, lock boxes and the like;

(viii)  all assumed owned real property and all assumed leased real property;

(ix)    all of the Sellers' rights under the Assumed Leases, including, without limitation, all rights to security deposits held pursuant thereto;

(x)     all leasehold improvements on the leased real property;

(xi)    all machinery, equipment (including all transportation and office equipment), fixtures, trade fixtures, furniture, furnishings, computer equipment, telephone systems and furniture owned by the Sellers wherever located;

(xii)   all the inventory;

(xiii)  all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located;

(xiv)   all vendor deposits;

(xv)    all claims, deposits, prepayments, prepaid expenses, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of

recoupment of every kind and nature of the Sellers with respect to the Acquired Assets except rights of set-off against the estate;

(xvi)    the right to receive and retain mail, accounts receivable payments and other communications (other than communications between the Company and its outside counsel);

(xvii)    the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the closing;

(xviii)    all advertising, marketing and promotional materials and all other printed or written materials;

(xix)    all transferable permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies;

(xx)    all books and records;

(xxi)    the business names "Horsehead Industries, Inc.", "Zinc Corporation of America", "Horsehead Resource Development Company, Inc.", "ZCA Mines, Inc.", "Stoney Ridge Materials, Inc.", "Chestnut Ridge Railway Company", "Equidae Partners", "HII Corporation", "HRD Investment Company, Inc.", "Minerals and Resources Recovery Corp.", "NJZ Colors, Inc.", "Palmer Water Company", "Pegasus Service Corporation", "Sterling Resources, Inc.", "The New Jersey Zinc Company, Inc.", "ZCA Engineered Powders, Inc.", "ZCA Oil & Gas, Inc.", "ZCA Powders, Inc." and "Zinc Company of America, Inc." and all goodwill as a going concern and all other intangible properties;

(xxii)    all telephone numbers;

(xxiii) all indemnities including, without limitation, the benefit of the indemnity from Viacom and Viacom, Inc. under the Viacom Agreement;

(xxiv) all rights to proceeds under any Debtors' insurance policies including, without limitation, all pollution legal liability policies or other policies providing coverage for environmental liabilities;

(xxv) all security deposits relating to Assumed Executory Contracts; and

(xxvi) the non-core assets and all rights of the Sellers to the proceeds arising from the sale or disposition of the non-core assets.

26. **Excluded Assets**. The Debtors shall retain their right, title and interest in and to (i) all existing contracts which are not Assumed Executory Contracts; (ii) the insurance recovery; (iii) excluded accounts receivable; (iv) excluded inventory; (v) excluded leasehold improvements; (vi) any pension plan, profit sharing plan, or other plan or program providing benefits to current or former employees of the Debtors other than any assumed plans; (vii) copies of all books and records relating to the conduct of the business prior to the closing date; (viii) shares of capital stock of or any ownership in any company, including any subsidiaries; (ix) the excluded owned real property; (x) non-core assets and all rights of the Debtors to proceeds arising from the sale or disposition of the non-core assets; (xi) excluded causes of action; (xii) claims, suits, proceedings and causes of action existing as of or after the closing date that relate to any excluded assets; (xiii) avoidance claims and causes of action under Section 510 and Sections 547 through 550 of the Bankruptcy Code (other than such claims specifically included in the Acquired Assets); and (xiv) those items set forth in the schedules to the Agreement (the "Schedules") (together with such Acquired Assets which Acquisition in its sole discretion expressly rejects).

27.     **Assumed Liabilities**.   Acquisition will assume only the following specific liabilities and obligations of the Sellers and no others: (i) accounts payable due to the Sellers' post-petition vendors and other accrued expenses, to the extent possible, in the amount and to the persons as set forth in the Schedules, (ii) amounts due and to become due on Assumed Executory Contracts to the extent arising after the closing, and (iii) the assumed indebtedness, if any.

28.     **Purchase Price**. The purchase price to be paid by Acquisition for the Acquired Assets shall be as follows (the "Purchase Price"):

(i)     $9,400,000 in cash payable to the persons and in the amounts set forth in the Agreement and the schedules attached thereto;

(ii)     a junior subordinated secured promissory note to the Sellers in an aggregate principal amount of $4,500,000 on the terms of that certain Outline of Principal Business Terms and Conditions for Acquisition of Substantially All Assets of Horsehead Industries, Inc. *et al.* by Horsehead Acquisition Corp. dated October 31, 2003 (the "Creditors' Term and Conditions") in form and substance satisfactory to the Buyer;

(iii)     the delivery and execution of a letter of credit assumption agreement and related documents pursuant to which Buyer shall assume Sellers' obligation to reimburse lenders under the existing letters of credit up to $29,238,565 (which existing letters of credit shall retain the benefit of all Liens on the Acquired Assets held by the lenders to secure reimbursement and other obligations under and with respect to the existing letters of credit); the Buyer will use best efforts to replace the existing letters of credit and terminate or assume all liabilities and the licenses with respect thereto within two years after the closing and otherwise on the terms of the Creditors' Term and Conditions and shall, in any event, replace the existing letters of credit and

terminate or assume all liabilities of the Lenders with respect thereto no later than two years after the closing date;

(iv)     the delivery by Buyer to Viacom of a junior subordinated promissory note in the aggregate principal amount of $12,000,000 in form and substance satisfactory to the Buyer and otherwise on the terms of the Creditors' Term and Conditions (the "Viacom Notes"); and

(v)     the delivery by the Buyer to TIAA of a junior subordinated promissory note to pay  $16,000,000 in principal and interest over five years based upon quarterly payments of $300,000 and a payment of $10,000,000 on the fifth anniversary of the closing with an imputed interest rate of 5% *per annum*, together with a junior subordinated secured promissory note in an aggregate principal amount of $2,500,000, both notes in form and substance satisfactory to the Buyer and otherwise on the terms of the Creditors' Terms and Conditions.

## BID PROCEDURES AND BREAKUP FEE

29.     The Agreement provides for a breakup fee in the amount of $2,900,000 (the "Breakup Fee") and certain Bid Procedures.

30.     **Competing Bids.**  Competing bidders shall have a right to submit a competing bid for the Acquired Assets subject to the following procedures and requirements:

(e)     all competing bids shall:

(1)     be in writing;

(2)     be in an amount at least equal to the sum of the Purchase Price and the Breakup Fee;

(3)     include a cash component in an amount not less than $12,800,000;

(4)     be on substantially the same terms as the Agreement;

       (5)      not be on terms and conditions which are more burdensome or less favorable to the Sellers than the terms of the Agreement;

       (6)      be for all or substantially all of the Acquired Assets;

       (7)      not contain any contingencies to the validity, effectiveness, and/or binding nature of the offer, including, without limitation, contingencies for financing, due diligence, or antitrust;

31.    "**Breakup Fee**".  The Breakup Fee shall be payable jointly and severally by each of the Sellers, in cash, to the Buyer in the amount of $2,900,000, upon the earlier to occur of (i) the sale of all or a substantial portion of the Acquired Assets (other than a sale solely of the non-core assets) in connection with a Higher and Better Offer, in which case such payment shall be paid to the Buyer out of the earnest deposit escrow, or (ii) the effective date of a confirmed plan of reorganization or liquidation by the Debtors pursuant to Chapter 11 of the Bankruptcy Code which does not include a third party purchaser, funder or investor or the Buyer.

## CONDITIONS PRECEDENT

32.    The obligations of Acquisition to perform the Agreement and close the transactions contemplated thereby are subject to the satisfaction, on or prior to the Closing Date, of certain conditions unless waived (in whole or in part) by Acquisition which include the following:

       (a)    <u>Approvals</u>.  All authorizations, consents, filings and approvals necessary to permit the Debtors to perform the transactions contemplated by the Agreement shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Acquisition, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect, in all material respects, including, without limitation,

with respect to all environmental permits. All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred, including, without limitation, the expiration of any waiting period required under the Hart Scott Rodino Antitrust Improvement Act or Federal Trade Commission regulations.

(b) <u>Non-Assumption/Rejection of Collective Bargaining Agreements</u>. Since Acquisition will not assume any collective bargaining agreements, the Debtors must have obtained the written consent of all labor organizations representing any of the Debtors' employees to waive against all parties any and all successorship provisions, obligations or claims under the Debtors' collective bargaining agreements which shall thereafter not be assumed by Horsehead, or in the alternative, the Debtors shall have obtained final Bankruptcy Court rejection of such collective bargaining agreements pursuant to Section 1113 and Section 1114 and any other applicable provisions of the U.S. Bankruptcy Code.

(c) <u>Material Adverse Change</u>. Since the date of latest balance sheet, there shall have been no material adverse change in the Business.

(d) <u>Cure Costs</u>. Prior to or at the Closing, the Debtors shall have provided for the payment of all cure obligations (pursuant to section 365 of the Bankruptcy Code) with respect to the Assumed Executory Contracts.

(e) <u>Agreements with Certain Creditors</u>. Acquisition shall have entered into agreements satisfactory to the Buyer with each of the Interested Parties on the terms of the Creditors' Terms and Conditions.

**THE PROPOSED SALE IS AN EXERCISE OF SOUND BUSINESS JUDGMENT, IS IN THE BEST INTEREST OF THE DEBTORS, THEIR ESTATES AND CREDITORS AND SHOULD BE APPROVED**

33.     The Debtors submit that ample authority exists for the approval of the proposed transaction and the competing offer procedures.

34.     Section 363 of the Bankruptcy Code provides, in relevant part, as follows:

(b)(1) The trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate.

***

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other that the estate, only if

***

(1)  applicable non-bankruptcy law permits sale of such property free and clear of such interest;

***

(2)  such entity consents;

***

(5)  such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(b)(1), (f).

35.     Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a Debtors' assets, the Second Circuit, in applying this section, has required that it be based upon the sound business judgment of the Debtors.  *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)* 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Chateaugay Corp.* 973 F.2d 141 (2d Cir. 1993); *In re Thomson McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990).

36.     In the instant case, the Debtors submit that the most important factor to consider in assessing the Debtors' business judgment is the effect of the proposed asset dispositions on the Debtors' estates and creditors.   With respect to the sale contemplated herein, the factors

mitigating in favor of approval are compelling. A sale is immediately necessary at this time because the Debtors do not have sufficient financial liquidity or resources to continue operations. Absent a sale at this time, the Debtors will be forced to cease their business operations.

37. The Debtors, together with their financial advisors and the Interested Parties, engaged in extensive negotiations with several entities regarding reorganization financing, and/or the sale of their business, the culmination of which was the receipt by the Debtors of a renewed offer from Acquisition. The Debtors determined that Acquisition's offer was the highest and best for the following reasons: (a) Acquisition offered the highest and best purchase price, (b) Acquisition demonstrated the ability to close on the transaction, and (c) Acquisition was willing to agree to sale terms satisfactory to the Debtors.

38. The terms of the Agreement were negotiated with Acquisition at arm's length and in good faith and the Debtors (as set forth below) accordingly request the Court determine Acquisition to be acting in good faith and entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code. Thus, the sale transaction represents substantial value to the Debtors' estates as it provides for favorable terms for the disposition of the Acquired Assets, at a price that represents fair and reasonable consideration.

39. Due to the uncertainty over the Debtors' business ownership, customers, suppliers and employees may erode the value of the Acquired Assets by abandoning the Debtors.

40. Accordingly, for all of the foregoing reasons, the Debtors submit that the sale transaction should be approved at this time.

### THE SALE OF THE ASSETS PURSUANT TO THE AGREEMENT SATISFIES THE GOOD-FAITH REQUIREMENT OF BANKRUPTCY CODE § 363(m)

41. Bankruptcy Code § 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under [section 363(b) or (c)]... of a sale or lease of property does not

> affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42. Although the Bankruptcy Code does not define the term "good faith purchaser," courts interpreting section 363(m) have held that "to show lack of good faith [a party] must show fraud, collusion ... or an attempt to take grossly unfair advantage of other bidders." Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.), No. 89 Civ. 3704 (KMW), 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990). See, e.g., In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)). Yet, because there is no bright line test, courts examine the facts of each case by concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

43. As noted above, with the assistance of Blackstone, the Debtors have undertaken substantial marketing efforts to sell the Assets and have solicited multiple offers therefor. As further noted above, the Debtors believe that Acquisition's offer of the Purchase Price is fair and reasonable under the circumstances, higher and better than any other offers received, and would be of great benefit to the Debtors' estate and its creditors. The Agreement was negotiated at arm's length and in good faith. Neither the Debtors, on the one hand, nor Acquisition, on the other, are related entities or share common officers or directors. Accordingly, the Court should find that Acquisition, or any other party that submits a higher or better offer for the Assets, is entitled to the protection of Bankruptcy Code § 363(m) with respect to the transactions contemplated by the Agreement and should be deemed a good faith purchaser.

## THE SALE OF THE ASSETS SATISFIES
## THE REQUIREMENTS OF BANKRUPTCY CODE § 363(n)

44.     Section 363(n) provides, in pertinent part, that "the trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale." 11 U.S.C. § 363(n).

45.     As noted above, in the Debtors' business judgment, the proposed Purchase Price represents a fair and reasonable price based upon their marketing efforts, the depressed state of the zinc industry, and the estimated value of the Assets.  There is to the best of the Debtors' knowledge, no agreement in place among the potential bidders for the Assets.  On the contrary, until the Court grants this Motion at the Sale Hearing, the Debtors will entertain other, better offers to purchase the Assets.

46.     Accordingly, the Debtors believe that the Court should find that a sale of the Assets to Acquisition, or to any other party that submits a higher and better offer therefor at or before the Auction, satisfies the requirements of section 363(n) of the Bankruptcy Code.

## THE AUTOMATIC STAY OF THE ORDER GRANTING THIS
## MOTION PURSUANT TO BANKRUPTCY RULE 6004(g) SHOULD BE WAIVED

47.     Federal Rule of Bankruptcy Procedure 6004(g) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(g).

48.     Because the proposed sale inures to the benefit of the Debtors' estates and creditors and, to the Debtors' knowledge, is not to the detriment of any party, the Debtors request a waiver of the provision in Bankruptcy Rule 6004(g) staying any order authorizing the use, sale, or lease of property until the expiration of 10 days after entry of the order, such that any order approving the Motion would be effective immediately.

## ASSIGNMENT OF ASSUMED EXECUTORY CONTRACTS

49.     The sale transaction includes the Debtors' assumption and assignment to Acquisition of some or all of the Assumed Executory Contracts listed on <u>Exhibit "B"</u> hereto, with Acquisition having the right to designate the specific Assumed Executory Contracts and Assumed Leases to be assumed and assigned up to five (5) business days prior to the Sale Hearing.[4]  <u>Exhibit "B"</u> also contains the cure amounts that will be paid to the parties to the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors reserve the right to amend the cure amounts at any time prior to the conclusion of the Sale Hearing.

50.     The Debtors, at the request of Acquisition, will seek Court authorization to assume and assign the Assumed Executory Contracts listed on <u>Exhibit "B"</u> to Acquisition pursuant to section 365 of the Bankruptcy Code.  The Debtors reserve the right to withdraw any such Assumed Executory Contract for assumption and assignment at any time prior to the conclusion of the Sale Hearing.

51.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases subject to the approval of the Bankruptcy Court:

(a)     Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debt the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

(A)     cures, or provides adequate assurance that the trustee will promptly cure such default;

---

[4]     Nothing contained herein shall be deemed an admission by the Debtors that any contract, lease or other agreement listed on <u>Exhibit "B"</u> is, in fact, an executory contract or an unexpired lease.  The Debtors specifically reserve their right to argue that any such contract, lease or other agreement is not an executory contract or an unexpired lease.

(B)     compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.
. . .
(f)(2)   The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. §§ 365(a), (b)(1), (f)(2).   Accordingly, Section 365 authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

52.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

53.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to

give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

54.     The Debtors believe that they can and will demonstrate that all requirements for the assumption and/or assignment of the executory contracts and unexpired leases proposed to be assigned to Acquisition (or such other purchaser who submits a higher or better offer for the Assets at the Auction) will be satisfied at or prior to the Sale Hearing. The Debtors will provide all parties to the Assumed Executory Contracts and Assumed Unexpired Leases an opportunity to be heard. The Debtors intend to demonstrate at the Sale Hearing that the purchaser of the Assets (be it Acquisition or any other party who submits the highest and best bid) adequately assures future performance under the Assumed Executory Contracts and Assumed Unexpired Leases and otherwise satisfy the requirements of Bankruptcy Code § 365(b)(3), as outlined above. Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the Assumed Executory Contracts and Assumed Unexpired Leases should be approved.

**SALE OF THE ASSETS IS FREE AND CLEAR OF ALL LIENS
AND IS EXEMPT FROM TRANSFER TAXES**

**Sale Free and Clear of Liens**

55.     Section 363 of the Bankruptcy Code, among other things, authorizes a debtor to use, sell or lease property of the estate outside the ordinary course of business free and clear of any interest in such property. See 11 U.S.C. § 363(f). As previously noted, the sale of the Acquired Assets will be free and clear of any and all Liens, which shall transfer and attach to the net sale proceeds.

56.     In that regard, the Debtors submit that the proposed sale of the Acquired Assets satisfies the requirements of Bankruptcy Code § 363(f). Among other things, if a holder of a

lien, claim, or encumbrance receives the requisite notice of this Motion and does not object within the prescribed time period, such holder will be deemed to have consented to the proposed sale of the Assets, and the Assets may then be sold free and clear of such holder's liens, claims, and encumbrances. See, e.g., Veltman v. Whetzel, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale, coupled with agreement to stipulation on authorizing sale free of interest, constituted consent); Hargrave v. Pemberton (In re Tabore, Inc.), 175 B.R. 855 (Bankr. D. N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of 363). The Debtors believe that the Bank Group and the Debtors' secured creditors which hold a lien on the Acquired Assets, consent to the proposed sale thereof.

57.     In addition, because the Acquired Assets will be sold for what the Debtors, in the exercise of their business judgment, approximates is at least their fair market value, particularly in light of the opportunity for competing offers following more than a year-long marketing process, the holders of any liens can be compelled to accept money in satisfaction of same, satisfying the requirement of Bankruptcy Code § 363(f)(5). See In re WPRV-TV, Inc., 143 B.R. 315, 321 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993).

**Sale Is Exempt from Transfer Taxes Under Section 1146(c)**

58.     Pursuant to section 1146(c) of the Bankruptcy Code, the "transfer... or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." This provision has been broadly construed to include sales and transfers which occur outside of a chapter 11 plan of reorganization and before or after confirmation of such chapter 11 plan. See, e.g., City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir. 1985) (sale generated approximately 75% of estate's available funds); In re Permar Provisions, Inc., 79 B.R.

530 (Bankr. E.D.N.Y. 1987); City of New York v. Smos Enters. (In re Smoss Enters. Corp.), 54

B.R. 950 (E.D.N.Y. 1985); In re Lopez Development, Inc. 154 B.R. 607 (Bankr. S.D. Fla. 1993)

(holding that a documentary tax exemption is applicable even after the dismissal of a bankruptcy

case). In so holding, the Second Circuit has focused upon whether the sale and transfer is

"necessary to the consummation of the plan." In re Jacoby-Bender, Inc., 758 F.2d at 842.

59. In the instant case, the Debtors' sale of the Acquired Assets is necessary to the

consummation of a plan and should be deemed to be "under a plan". After satisfying their

obligations to their debtor in possession lenders[5], the Debtors propose to segregate the remaining

net proceeds from the sale of the Acquired Assets and to thereafter distribute such amounts to

their creditors pursuant to a plan of liquidation or order of the Court. In that regard, the

remaining net proceeds will be used to reduce claims asserted against the Debtors, and to fund a

plan of liquidation and will not be utilized by the Debtors for working capital purposes or

otherwise.

60. Consequently, the Debtors submit that the sale of the Acquired Assets and

distribution of the net proceeds, pursuant to a plan of liquidation, facilitates confirmation of the

Debtors' Chapter 11 plan, and thus falls within the scope of the exemption provided for under

section 1146(c) of the Bankruptcy Code. See In re Permar Provisions, Inc., 79 B.R. at 534 (sale

of real property one year prior to plan confirmation was exempt under section 1146(c) where sale

proceeds were distributed to secured and unsecured creditors).

**Sale of the Property Pursuant to Auction**

61. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the

ordinary course of business may be by private sale or by public auction. The Debtors have

---

[5] See the Court's DIP Facility Order dated January 7, 2003.

determined that the sale of the Acquired Assets by auction will enable it to determine if higher or better offers exists for the Acquired Assets, thus maximizing the value of their assets for the benefit of their creditors and estates.

62. In particular, the Debtors propose to conduct the Auction at the offices of Simpson Thacher & Bartlett LLP, on **November 25, 2003**. In connection therewith, the Debtors hereby request that prior to the Auction, the Court approve the Breakup Fee and Bid Procedures and other stalking horse protections contained in the Agreement.

## THE BID PROCEDURES, BREAKUP FEE AND OTHER TERMS OF THE AUCTION SHOULD BE APPROVED

63. The Debtors submit that good cause exists to approve the Bid Procedures for the Auction, including the Breakup Fee.

64. Sellers of assets often employ bidding protections in order to encourage bids. Bidding protections take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, such as due diligence expenses and compensating a bidder for its lost opportunity costs. See In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). A breakup fee is a fee paid by a seller to a potential acquirer of assets in the event the transaction is not consummated or certain conditions in the purchase agreement are not met. Breakup fees therefore are "important tools to encourage bidding and to maximize the value of the debtor's assets." The Official Committee of Subordinated Bondholders v. Integrated Resources Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992).

65. Outside the bankruptcy context, courts commonly approve breakup fees. Such fees are presumptively appropriate under the business judgment rule and non-bankruptcy courts rarely rule on their propriety. See, e.g., Cottle v. Storer Communications, Inc., 849 F.2d 570,

578 (11th Cir. 1988); <u>CRTF Corp. v. Federated Dep't. Stores</u>, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); <u>Samjens Partners I v. Burlington Indus.</u>, 663 F. Supp. 614, 624 (S.D.N.Y. 1987).

66.     Similarly, bankruptcy courts generally presume that the debtor's decision to agree to a breakup fee is a valid exercise of its business judgment.  <u>In re Integrated Resources, Inc.</u>, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992); <u>In re 995 Fifth Avenue Associates, L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)[6].   Bankruptcy courts will generally authorize bidding protections such as breakup fees where such bidding protections enhance rather than deter bidding.  <u>See</u>, <u>e.g.</u>, <u>995 Fifth Ave. Associates</u>, 96 B.R. at 28.   One such situation is where the bidder is a "stalking horse" -- an initial interested party (like Acquisition here) that promotes competition and encourages other bidders to come forward by submitting a binding offer and providing a baseline against which higher and better offers can be measured.  <u>In re Marrose Corp.</u>, Nos. 89 B 12171-12180 (CB), 1992 WL 33848 at 5 (Bankr. S.D.N.Y. 1991); <u>In re Integrated Resources, Inc.</u>, 135 B.R. 746, 250 (Bankr. S.D.N.Y. 1992).

**The Proposed Bid Procedures Are Designed to Ensure that the**
**<u>Debtors Achieve the Maximum Purchase Price for the Assets</u>**

67.     As described above, the Debtors and their advisors have undertaken substantial efforts to sell the Acquired Assets since September of 2002.  Nevertheless, in order to ensure that the Debtors' estates receive the maximum return for the Acquired Assets, the Debtors, in accordance with Bankruptcy Code § 363(b)(1) and Bankruptcy Rule 6004(f)(1), propose to sell the Acquired Assets subject to higher or better offers therefor made prior to the Sale Hearing and

---

[6]     As the District Court for the Southern District of New York held in <u>In re Integrated Resources, Inc.</u>, 147 B.R. at 657, three issues must be considered by bankruptcy courts in assessing bidding protections such as break-up fees:  "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (2) does the fee hamper, rather than encourage, bidding, [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?"  The court added that a "break-up fee" may serve one of three functions:  "(1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders."  <u>Id</u>. at 662.

potentially to conduct an Auction at or prior to the Sale Hearing. In that regard, the Debtors and Blackstone will continue to solicit higher or better offers from other likely potential purchasers of the Purchased Assets before the Sale Hearing, including providing information regarding the location, date, and time of the potential Auction and the Sale Hearing in the event that any party wishes to make a higher or better offer for the Assets.

68.     The Debtors submit that the Bid Procedures for the Auction and the proposed sale are appropriate and necessary and will enable them to realize the maximum value from the Acquired Assets. Therefore, the Bid Procedures are in the best interests of their estates.

69.     Specifically, the Breakup Fee (which is the result of good faith, arm's-length negotiations between the parties) provides meaningful incentives for Acquisition to proceed with the sale transaction and at the same time to promote competitive bidding for the Acquired Assets. Acquisition is only willing to become a stalking horse for competitive bids of the Assets if the proposed Bid Procedures (including the Breakup Fee) are approved. Accordingly, the Court "should uphold [the Breakup Fee] which was not tainted by self-dealing and was the product of arm's-length negotiations." In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

70.     In addition, the proposed minimum overbid will ensure that the competitive bidding process compensates the Debtors for the costs of the Breakup Fee and permits the Debtors' estates to derive an added economic benefit for such competing bids. Thus, approval of the Bid Procedures may lead to further competition and the establishment of a baseline against which higher and better offers will be measured. If an Auction ensues, the Bid Procedures, including those (such as the provision regarding the minimum overbid) relating to subsequent

bids, are reasonably calculated to encourage bids within the upper range of reasonably anticipated values for the Assets. If no Auction ultimately ensues, the Bid Procedures, including the Breakup Fee, are still necessary to encourage Acquisition to serve as a stalking horse and to guaranty a minimum amount for the Assets, which here will be the Purchase Price.

71.     In addition, the Bid Procedures proposed here are "reasonably related to the bidder's efforts and the transaction's magnitude." Integrated Resources, 147 B.R. at 662-63. The proposed Breakup Fee in the amount of $2,900,000 is only payable under the limited circumstances set forth herein.

72.     Moreover, approval of the Bid Procedures (including the Breakup Fee) is appropriate because (unlike the prior proposed transaction with Acquisition and the proposed transaction with NAZC) the Interested Parties (*i.e.*, the Bank Group, Viacom, and Teachers) have consented to the proposed sale to Acquisition.

73.     Accordingly, the Debtors respectfully submit that this Court authorize the Bid Procedures, including the proposed Breakup Fee.

**NOTICE AND HEARING TO CONSIDER SALE AND
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
EXECUTORY CONTRACTS AND ASSUMED LEASES**

74.     The Debtors also request that the Court schedule the hearing to approve the sale transaction on an expedited basis for no later than **November 26, 2003**. The purpose of the Sale Hearing will be to approve the proposed sale to Acquisition in accordance with the Agreement or to such other person or entity submitting the highest or best offer at the Auction in compliance with the Agreement and the Auction procedures set forth herein and in the Procedures Order.

75.     Bankruptcy Rule 2002(a) provides, in relevant part, that:

(a)     Twenty-day Notices to Parties in Interest. Except as provided in subdivisions (h), (i) and (1) of this rule, the clerk, or some other person as the court may direct, shall give the Debtors, the trustee, all creditors and indenture trustees at least 20 days

> notice by mail of . . . (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice. . . .

Fed. R. Bankr. P. 2002(a)(2); see also Fed. R. Bankr. P. 9006(c).

76.     As set forth above, it is vital that this Court approve the sale of the Acquired Assets in a timely fashion because the Debtors' lack of liquidity to fund their operation will cause customers, suppliers, and employees to abandon the Debtors as suppliers, customers and employees and thereby erode the value of the Acquired Assets. Accordingly, the Debtors request that the Court schedule a hearing approving the sale for no later than **November 26, 2003**.

77.     Specifically, the Debtors propose to serve notice of the Motion and Procedures Hearing by serving a copy of the Scheduling Order and this Motion (including all exhibits to the Motion but excluding the Agreement and the Schedules to the Agreement) by overnight delivery service for next business day receipt upon: (a) the United States Trustee; (b) counsel to the Official Committee of Unsecured Creditors; (c) counsel to the agent of the Debtors' Bank Group; (d) Acquisition, by its counsel; (e) counsel to Viacom; (f) counsel to Teachers; (g) the Federal Trade Commission; (h) the Department of Justice; (i) any party that filed an objection to the prior proposed Procedures Orders; and (j) all entities which have filed a notice of appearance and request for papers in these Cases.

78.     The Debtors further propose, to the extent that they have not done so already, to serve a copy of the Motion (including the Agreement) and the Procedures Order by first class mail upon (a) all of the foregoing entities, (b) all entities known to the Debtors to have expressed an interest in the Acquired Assets during the past year; (c) all parties to the Assumed Executory Contracts and Assumed Leases: (d) all secured parties of record and any other parties or entities known by the Debtors to assert liens or claims against, or rights or interests in, any or all of the

Acquired Assets; (e) the Internal Revenue Service, the New York State Department of Taxation and Finance and any other taxing authorities that may assert liens, claims or interests in the Acquired Assets; (f) all necessary parties to governmental approvals or permits, if any; and (g) all applicable federal, state, and local regulatory, environmental, and taxing authorities and recording offices that have a reasonably known interest in the relief requested (including, but not limited to, the United States Environmental Protection Agency, the New York State Department of Environmental Conservation and the Pennsylvania Department of Environmental Protection).

79.     In addition, the Debtors further propose (a) to serve a notice of the Motion reflecting entry of the Procedures Order, by first class mail, upon all known creditors and equity holders of the Debtors.

80.     As the Debtors have more than 6,000 creditors, the Debtors submit that the time afforded and manner for such notice is reasonable and permissible pursuant to sections 102, 105, 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008.  The Debtors propose that objections, if any, to the relief sought hereby must conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, must be made in writing and received in the Chambers of the Honorable Stuart M. Bernstein, Chief United States Bankruptcy Judge, United States Bankruptcy Court, One Bowling Green, Room 729, New York, New York 10004 and a copy served upon (a) Angel & Frankel, P.C., counsel for the Debtors, 460 Park Avenue, New York, NY  10022-1906, Attn:  Jeffrey K. Cymbler, Esq; (b) Kirkland & Ellis LLP, counsel to Acquisition, Citigroup Center, 153 E. 53rd Street, New York, NY  10022-4611, Attn:  Daniel J. Eisner, Esq.; (c) Blank Rome, LLP, counsel to the Official Committee of Unsecured Creditors, 405 Lexington Avenue, New York, NY 10174-0208, Attn:  Michael Z.

Brownstein, Esq.; (d) Simpson Thacher & Bartlett LLP, counsel to the Bank Group, 425 Lexington Avenue, New York, NY 10017, Attn: Kathrine A. McLendon, Esq.; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to Viacom, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn: Stephen J. Shimshak, Esq.; (f) Friedman Kaplan Seiler & Adelman LLP, counsel to Teachers, 1633 Broadway, New York, NY 10019-6708, Attn: Hal Neier, Esq.; and (g) the Office of the United States Trustee for the Southern District of New York, Attn: Paul K. Schwartzberg, Esq., 33 Whitehall Street, 21st Floor, New York, NY 10004, and shall be filed with the Clerk of the Bankruptcy Court in accordance with General Order M-242 of the Bankruptcy Court entered on January 19, 2001, establishing procedures for electronic filing, so as to be received by the above parties not later than 12:00 noon two (2) business day(s) prior to the Procedures Hearing if the objection is to the Procedures Order and not later than 12:00 noon two (2) business day(s) prior to the Sale Hearing if the objection is to the proposed sale of Acquired Assets.

81.    **PARTIES SHOULD TAKE NOTICE THAT A NUMBER OF CONSEQUENCES MAY RESULT FROM THE FAILURE TIMELY TO OBJECT TO THE SALE MOTION, INCLUDING THE FOLLOWING CONSEQUENCES:**

(a)    if a party to an Assumed Executory Contract or Assumed Lease fails to timely object to the cure amount proposed by the Debtors, the cure amount may conclusively be fixed in the dollar amount proposed by the Debtors;

(b)    if a party to an Assumed Executory Contract or Assumed Lease fails to timely object to the assumption and/or assignment of the Assumed Executory Contract or Assumed Lease to the Successful Bidder, such party may be deemed to have consented to such assumption and/or assignment and may be forever barred, permanently enjoined,

and estopped from asserting (i) any other or further claims against the Debtors, the Successful Bidder, their respective successors and assigns, the Purchased Assets, or the property or assets of any or all such parties, as to such Assumed Executory Contract or Assumed Lease or cure amount, except for the Assumed Liabilities or obligations first accruing or arising under such assigned agreements from and after the date of assignment (which obligations will solely be and remain the liability of the Successful Bidder); or (ii) that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied under such Assumed Executory Contract or Assumed Lease;

(c)     if a party that asserts a Lien in any of the Acquired Assets fails to timely object to the sale of the Acquired Assets free and clear of such party's asserted Lien, then the Acquired Assets will be transferred to the Successful Bidder free and clear of such party's asserted Lien, and such Lien shall thereafter be transferred to and continue solely in the sales proceeds, but will no longer attach to any of the Acquired Assets; and

(d)     as a general matter, if any party in interest fails to object to any other relief requested in the Motion, such failure may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

82.     Each party should review Exhibit "B" (List of Executory Contracts and Unexpired Leases that the Debtors Intend to Assume and Assign to the Buyer) to determine whether it is subject to a contract, lease or agreement that the Debtors are seeking to assume and/or assign hereby.  Also, Acquisition is permitted under the Asset Purchase Agreement at any time prior to the fifth (5) business day preceding the Sale Hearing to, in its sole discretion, amend or revise the list of Assumed Executory Contracts or Assumed Leases.  Furthermore, the

Sellers, in their sole discretion, reserve their rights to amend or revise the cure amounts at any time prior to the Sale Hearing.

## **PRIOR REQUEST FOR RELIEF**

83.     Except as set forth above, no previous request for relief has been made to this or any other court.

## **MEMORANDUM OF LAW**

84.     The Debtors submit that the relevant legal authorities are set forth herein and, accordingly, that the requirement set forth in Local Bankruptcy Rule 9013-1(b) is satisfied.

WHEREFORE, the Debtors respectfully request (i) the entry of the Scheduling Order annexed hereto as Exhibit "A" and thereafter (ii) the entry of the Procedures Order which is annexed hereto as Exhibit "C" at the Procedures Hearing,  (iii) the approval of the sale of the

Acquired Assets at the Sale Hearing pursuant to an order, and (iv) the granting by the Court of

such further relief as is just and proper.

Dated: New York, New York
      November 12, 2003

                       ANGEL & FRANKEL, P.C.
                       Attorneys for Debtors and Debtors-in-Possession

                       By:     /s/ Joshua J. Angel
                                Joshua J. Angel, Esq. (JA-3288)
                                Jeffrey K. Cymbler, Esq. (JC-3261)
                                Craig R. Nussbaum, Esq. (CN-8742)
                       For the Firm
                       460 Park Avenue
                       New York, New York 10022-1906
                       (212) 752-8000