UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                         Chapter 11

HH LIQUIDATING CORP., *et al.*, f/k/a                          Case Nos.  02-14024 (SMB) through
HORSEHEAD INDUSTRIES, INC., *et al.,*                                         02-14027 (SMB)

                                   Debtors.                    Jointly Administered
------------------------------------------------------------x

**MODIFIED SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
THE FIRST AMENDED JOINT CONSOLIDATED PLAN OF LIQUIDATION OF HH
LIQUIDATING CORP., *et al.* f/k/a HORSEHEAD INDUSTRIES, INC., *et al.*, UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Dated: New York, NY
June ——,9, 2010

HERRICK, FEINSTEIN LLP
Joshua J. Angel, Esq.
Frederick Schmidt, Esq.
Seth F. Kornbluth, Esq.
Hanh V. Huynh, Esq.
2 Park Avenue
New York, New York 10016
(212) 592-1400

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF
THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE
SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED
THIS DISCLOSURE STATEMENT

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND THE OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THEIR BUSINESSES AND EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND OTHER WRITINGS RELATING TO THE DEBTORS. NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORTS THE PLAN AND BELIEVES THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE TO CREDITORS UNDER THE CIRCUMSTANCES.**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ ~~5~~1

     A.      Holders of Claims and Equity Interests Entitled to Vote ...................... ~~7~~3

     B.      Voting Procedures .................................................................................. ~~7~~3

     C.      Confirmation Hearing ............................................................................ ~~9~~5

II.      OVERVIEW OF THE PLAN AND SUMMARY TREATMENT OF CLAIMS AND INTERESTS ...................................................................................... ~~9~~5

III.      OVERVIEW OF CHAPTER 11 .................................................................. ~~12~~8

IV.      DESCRIPTION OF THE DEBTORS' BUSINESS ..................................... ~~13~~9

     A.      Background ............................................................................................ ~~13~~9

     B.      Events Leading to the Filing of the Chapter 11 Cases .......................... ~~13~~9

V.      THE CHAPTER 11 CASES ......................................................................... ~~13~~9

     A.      First Day Motions and Orders ............................................................... ~~13~~9

     B.      The Official Committee of Unsecured Creditors ................................ ~~15~~11

     C.      The Debtors' Sale of Substantially All of Their Assets and the Carveout Settlement ............................................................................ ~~16~~12

     D.      Sales of Remaining Non-Core Assets ................................................... 13

         1.      Balmat Mine ............................................................................. 13

         2.      Central Lab Building ................................................................ 13

         3.      Antelope Valley Property ........................................................ 14

         4.      Monaca Mall Property ............................................................. 14

         5.      West Plant Property .................................................................. 15

     E.      Preference Actions ................................................................................ 15

     F.      Disclosure Statement/Plan Confirmation Hearings ........................... ~~19~~16

VI.      SUMMARY OF THE PLAN OF REORGANIZATION ............................. ~~20~~16

     A.      Introduction .......................................................................................... ~~20~~16

B.  Classification and Treatment of Administrative Expense Claims, Claims and Equity Interests Under the Plan...................................2016

    1.  Unclassified—Administrative Expense Claims...................2420

    2.  Unclassified—Priority ~~Tax~~ Claims.................................2622

    3.  Class 1—Secured Claims (Unimpaired; therefore, deemed to have accepted the Plan and not entitled to vote) ............................2824

    4.  Class 2—~~Non-Tax Priority Claims (Impaired; deemed to have rejected the Plan)........................................~~**Error! Bookmark not defined.**

    ~~5.~~    ~~Class 3—~~Unsecured Claims (Impaired; therefore, entitled to vote to accept or reject the Plan)......................................................2825

    ~~6.~~5.  Class ~~4~~3—Equity Interests (Impaired; deemed to have rejected the Plan) ...........................................................................2926

C.  Means of Distributions Under the Plan and Implementation..........................3026

    1.  Liquidation of Debtors' Assets .............................................3026

    2.  Substantive Consolidation ....................................................3128

    3.  Settlements Critical to Implementation of the Plan ....................................30

    4.  Officers and Directors of the Debtors................................3436

    ~~4.~~5.  Formation of Liquidation Trust .........................................3436

    ~~5.~~6.  Treatment of Liquidation Trust for Federal Income Purposes; No Successor-in-Interest...................................................................3538

    ~~6.~~7.  Appointment of the Liquidation Trustee...............................3739

    ~~7.~~8.  Retention of Professionals and Other Persons .....................3840

    ~~8.~~9.  Liquidation Trustee Standard of Care; Exculpation ............3841

    ~~9.~~10. Termination of the Liquidation Trust ..................................3941

    ~~10.~~11. Termination of Liquidation Trustee.....................................3942

    ~~11.~~12. Indemnification .......................................................................3942

    ~~12.~~13. Preservation of Records and Documents .............................4043

    ~~13.~~14. Corporate Action....................................................................4143

14.15. Cancellation of Notes, Instruments, Debentures and Equity
Securities............................................................................................4143

15.16. Effect of Appeals ............................................................................4143

D. Means of Distribution and Funding ..........................................................4144

1. Distribution Account ...........................................................................4144

2. Collection of Liquidation Trust Assets .............................................4244

3. Payment of Plan Expenses .................................................................4245

4. Distribution of Liquidation Trust Assets ..........................................4345

5. Distribution Powers ...........................................................................4345

6. Distribution Procedures .....................................................................4346

7. Date of Distributions .........................................................................4446

8. Delivery of Distributions ...................................................................4446

9. Fixing of Claims ..................................Error! Bookmark not defined.47

10. Unclaimed Distributions ...................................................................4547

11. Fractional Dollars..............................................................................4547

12. Setoffs and Recoupment ....................................................................4548

13. DeMinimus Payments .......................................................................4548

E. Procedures for Resolving Disputed Claims Under the Plan .....................4648

1. The Deadline for Objections to Claims .............................................4648

2. Disputed Claims .................................................................................4649

3. Reserve Provisions for Disputed Claims ..........................................4749

4. Disputed Payments.............................................................................4850

5. No Distributions Pending Allowance ................................................4851

6. Voting Rights of Holders of Disputed Claims ..................................4851

F. Treatment of Executory Contracts and Unexpired Leases .......................4951

1. Rejected If Not Assumed ...................................................................4951

2.       Bar Date for Rejection Claims ...................................................................... ~~49~~52

3.       Objection to Rejection ...................................................................... ~~50~~52

G.     Conditions Precedent to Effective Date ...................................................... ~~50~~52

1.       Conditions Precedent to Effective Date ............................................ ~~50~~52

2.       Effect of Failure of Conditions Precedent ........................................ ~~51~~53

H.     Effect of Confirmation of the Plan............................................................ ~~51~~53

1.       No Discharge .................................................................................... ~~51~~53

2.       Vesting of Assets ............................................................................. ~~51~~53

3.       Legal Binding Effect ........................................................................ ~~51~~54

4.       Term of Injunctions or Stays............................................................ ~~51~~54

5.       Injunction ........................................................................................ ~~52~~54

~~6.~~       ~~The Debtors' Release~~ .............................................................................. ~~53~~

6.       Clarification of Injunction ................................................................. 55

7.       Exculpation,~~ Release and Injunction of Released Parties~~ .................... ~~53~~ 56

8.       Preservation of Insurance ................................................................. ~~54~~56

9.       Indemnification Rights .................................................................... ~~54~~56

10.     Immunity ......................................................................................... ~~55~~57

I.      Retention of Jurisdiction ...................................................................... ~~55~~57

1.       Scope of Jurisdiction........................................................................ ~~55~~57

J.      Miscellaneous Provisions ...................................................................... ~~57~~59

1.       Exemption from Certain Transfer Taxes .......................................... ~~57~~59

2.       Asset Sales ...................................................................................... ~~58~~60

3.       Revocation and Withdrawal of the Plan .......................................... ~~58~~60

4.       ~~Compromise of Controversies~~ ...................................................... ~~59~~

~~5.~~       The Creditors' Committee .............................................................. ~~62~~60

~~6.~~5.    Exhibits .......................................................................................... ~~62~~61

7.6. Successors and Assigns ...................................................... 6261

8.7. Payment of Statutory Fees ................................................ 6261

9.8. Amendment or Modification of the Plan ............................... 6361

10.9. Post-Confirmation Immaterial Modifications ........................ 6361

11.10. Severability of Plan Provisions ...................................... 6362

12.11. Governing Law ......................................................... 6462

13.12. Notices ................................................................... 6462

14.13. Reservation of Rights ................................................. 6563

15.14. Closing of the Chapter 11 Cases ..................................... 6563

16.15. Post-Confirmation Date Service List ................................ 6564

17.16. Filing or Execution of Additional Documents ...................... 6664

VII. CONFIRMATION PROCEDURE .................................................. 6664

    A. Solicitation of Votes .................................................... 6664

    B. The Confirmation Hearing .............................................. 6765

    C. Confirmation ............................................................ 6866

        1. Acceptance ......................................................... 6867

        2. Feasibility .......................................................... 6967

        3. Best Interests Test ................................................ 6967

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................................................. 7169

    A. Liquidation Under Chapter 7 .......................................... 7169

    B. Alternative Plan of Reorganization .................................... 7169

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ............................... 7170

    A. Certain Bankruptcy Law Considerations ............................. 7270

        1. Risk of Non-Confirmation of the Plan ........................... 7270

        2. Risk of Non-Occurrence of the Effective Date ................. 7270

B. Certain Tax Matters ................................................................................~~72~~71

C. Additional Factors to be Considered...............................................................~~72~~71

    1. The Debtors Have No Duty to Update..................................................~~72~~71

    2. No Representations Outside This Disclosure Settlement Are
       Authorized..........................................................................................~~73~~71

    3. Claims Could Be More Than Projected ...............................................~~73~~71

    4. Projections and Other Forward-Looking Statements Are Not
       Assured, and Actual Results May Vary....................................~~73~~72

    5. No Legal or Tax Advice is Provided to You By This Disclosure
       Statement..........................................................................................~~73~~72

    6. No Admission Made ...........................................................................~~74~~72

X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......~~74~~72

A. Federal Income Tax Consequences to Creditors ................................................~~75~~74

B. Federal Income Tax Consequences to the Debtors...........................................~~76~~74

    1. Cancellation of Indebtedness ..............................................................~~76~~74

    2. Net Operating Losses of Debtors .........................................................~~77~~75

    3. Alternative Minimum Tax ..................................................................~~77~~75

C. Additional Federal Income Tax Considerations for All Claim Holders...........~~77~~76

    1. Distributions in Discharge of Accrued Interest ....................................~~77~~76

XI. RECOMMENDATION AND CONCLUSION...........................................................~~78~~77

**EXHIBIT A—PLAN**

**EXHIBIT B—DISCLOSURE STATEMENT ORDER**

**EXHIBIT C—BALMAT MINE SETTLEMENT**

# I.
## INTRODUCTION

On August 19, 2002 (the "Petition Date"), HH Liquidating Corp. f/k/a Horsehead Industries, Inc., HRD Liquidating Corp. f/k/a Horsehead Resource Development Company, Inc., ZCA Liquidating Corp., f/k/a as ZCA Mines, Inc. and SRM Liquidating Corp. f/k/a Stoney Ridge Materials, Inc. (collectively, "Horsehead," or the "Debtors') each filed a petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court"). On April 9, 2010, the Debtors filed their first amended joint consolidated plan of liquidation, dated April 9, 2010 (as may be further amended, modified or supplemented, the "Plan"), a copy of which is annexed as Exhibit A, which sets forth the manner in which Claims against and Equity Interests in the Debtors will be treated. This Disclosure Statement (the "Disclosure Statement") describes certain aspects of the Plan (including the treatment of creditor Claims under the Plan), the Debtors' businesses and related matters. Unless otherwise defined, all capitalized terms have the meanings ascribed to them in the Plan.

As discussed more fully below, the Debtors, in consultation with their advisors, and the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed by the Office of the United States Trustee (the "U.S. Trustee") in the Debtors' jointly-administered chapter 11 cases (the "Chapter 11 Cases"), and the Creditors' Committee's legal advisors, have concluded that recoveries to creditors will be maximized under the Plan through the liquidation and distribution of the Debtors' assets.

This Disclosure Statement is submitted to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the hearing to consider

HF 5829691v.611 #12807/0001

confirmation of the Plan (the "Confirmation Hearing") presently scheduled for [   ]August 31, 2010 at 10:00 a.m.

Attached as Exhibits to this Disclosure Statement are copies of the following:

• The Plan (Exhibit A); and

• An Order of the Court dated [   ] (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B)

In addition, a Ballot for the acceptance or rejection of the Plan is being transmitted with this Disclosure Statement to the holders of Impaired Claims that are entitled to accept or reject the Plan; an Administrative Expense Claim Consent Form is being transmitted to holders of Administrative Expense Claims; and a Priority Claim Consent Form is being transmitted to holders of Priority Claims.

On [   ], after notice and a hearing, the Court approved the Disclosure Statement and determined that the Disclosure Statement contained adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to

vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the other Exhibits hereto and the instructions accompanying the Ballot(s) in their entirety before voting. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of a vote to accept the Plan may be made without giving the voter a Disclosure Statement approved by the Court.

A.    **Holders of Claims and Equity Interests Entitled to Vote**

Only impaired holders of Allowed Claims or Interests are entitled to vote to accept or reject a proposed chapter 11 plan. Unimpaired Classes are deemed to have accepted the Plan and are not entitled to vote. Classes of Claims or Interests that will not receive any distribution under a reorganization plan are deemed to have rejected such plan and also are not entitled to vote.

Under the Debtors' Plan, only Class 2 (Unsecured Claims) is impaired and entitled to vote on the Plan. Class 3 (Equity Interests) will receive no distributions under the Plan and are therefore deemed to have rejected the Plan. Class 1 (Secured Claims) is unimpaired and conclusively deemed to have accepted the Plan.

The Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that vote for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article VII, "Confirmation Procedures."

B.    **Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for that purpose. If you hold a Claim or an Interest in more than one Class and you are entitled to vote in more than one Class, you will receive separate Ballots that must be used for each separate Class.

Please vote and return your Ballot(s) directly to the following address:

If by first class mail:
**HH Liquidating Corp. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**PO Box 5295, Grand Central Station**
**New York, NY 10163-5295**

If by overnight/hand delivery:
**HH Liquidating Corp. Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**

**DO NOT RETURN ANY OTHER INSTRUMENTS OR AGREEMENTS WITH YOUR BALLOT.  TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. ON [  ],AUGUST 24, 2010.**

Each holder of an Allowed Claim in an Impaired Class which receives or retains property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other controlling order or orders of the Bankruptcy Court.

Pursuant to the Disclosure Statement Order, the Court set [   ], 2010, as the "Record Date" for voting on the Plan.  Accordingly, the holders of Claims as of the Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call Larisa Poretsky at 212-592-6191, during regular business hours.

4

### C.    Confirmation Hearing

A hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on [ ]August 31, 2010 at [ ]10:00 a.m., Eastern Standard Time, before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the Court, One Bowling Green, New York, New York 10004.  The Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [ ].August 24, 2010, at 54:00 p.m., Eastern Standard Time, in the manner described in the Disclosure Statement Order.  Service of any objection to confirmation must be served upon:  (1) Herrick, Feinstein LLP, attorneys for the Debtors, 2 Park Avenue, New York, New York 10016, attn: Frederick Schmidt; (2) Blank Rome LLP, counsel to the Creditors' Committee, 405 Lexington Avenue, New York, NY 10174, attn: Michael Brownstein and Rocco Cavaliere; (3) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Paul K. Schwartzberg; and (4) all entities which have filed notice of appearance and demand for service of documents in these cases.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.   THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

## II.
## OVERVIEW OF THE PLAN AND SUMMARY
## TREATMENT OF CLAIMS AND INTERESTS

The Plan is a liquidating plan.  Prior to the filing of the Plan, the Debtors sold substantially all of their assets to Horsehead Acquisition Corp., a subsidiary of Sun Capital Partners.  A significant portion of the proceeds of the Sale were used to pay the Lenders and

certain parties to executory contracts ~~in full~~.  Under the Plan, the remaining proceeds (and any other assets, once liquidated) will be distributed to Creditors under the terms, and in accordance with the priorities, set forth in the Plan.  Interest Holders will receive nothing under the Plan.

To implement its terms, the Plan contemplates the substantive consolidation of the Debtors.  As of the Effective Date, a Liquidation Trust will be appointed, and will have full authority to act, as estate representative of the Liquidation Trust pursuant to section 1123(b)(3) of the Bankruptcy Code.  The Liquidation Trust will marshal the Liquidation Trust's remaining assets, administer claims, object to claims, if appropriate, and make Distributions under the Plan.

The following table briefly summarizes the specific classification and treatment of Claims and Equity Interests under the Plan.

SUMMARY OF CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

<u>Unclassified Claims</u>

The Plan proposes that, subject to the conditions set forth in Article VI, Section G hereof, on the Effective Date, or as soon thereafter as is reasonably practicable, Holders of unpaid Administrative Expense Claims will receive their Pro Rata Share of between $3 - $3.25 million[1] and Priority Claims will receive their Pro Rata Share of $250,000.  Thereafter, as more specifically set forth in Section 2.01 below, Holders of Allowed Administrative Expense Claims may receive periodic cash distributions until their Allowed Administrative Expense Claims are paid in full or until the Liquidation Trust Assets are exhausted.  Holders of Allowed Priority Claims, as more specifically set forth in Section 2.04 below will, to the extent all Allowed

---

[1] The availability of these funds are subject to Court approval ~~and consummation of the Balmat Mine Settlement (defined in Article V, Section D(1), herein) as well as the approval of Blackstone's fees and escrow (as~~ of the compromises described in Article VI, Section ~~CJ(1)~~4).

Administrative Expense Claims have been paid in full, receive periodic cash distributions until their Allowed Priority Claims are paid in full or until the Liquidation Trust Assets are exhausted.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Allowed Claim Amount (By Class) |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired; the Plan will not alter any of the legal, equitable and contractual rights of the Holders of Class 1 Claims. Unless otherwise agreed to by the Holder of an Allowed Class 1 Claim and the Debtors or the Liquidation Trustee, or as otherwise addressed in prior Court orders, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, one of the following treatments, as soon as practicable after the Effective Date in the sole discretion of the Liquidation Trustee: (i) the ~~return of such Holder's collateral; (ii) the~~ payment in cash equal to the amount of such Allowed Secured Claim; or (~~iii~~ii) the payment of such other distributions as necessary to satisfy the requirements of the Bankruptcy Code. Holders of Class 1 Secured Claims are deemed to have accepted the Plan. | $0 |
| 2 | Unsecured Claims | Impaired; within 180 days of the Effective Date, holders of Allowed Class 2 Claims will receive their Pro Rata Share of the SPM Settlement Proceeds. Thereafter, following the payment in full of all (i) Allowed Administrative Expense Claims and (ii) Allowed Priority Claims, the Liquidation Trust shall distribute to each holder of an Allowed Class 2 Claim, the Pro Rata Share of the then remaining Cash on hand from the Liquidation Trust Assets, in addition to the SPM Settlement Proceeds. | $50 million - $450 million |
| 3 | Equity Interests | Impaired; the holders of Allowed Class 3 Interests shall receive nothing under the Plan. All existing shares of Equity Interests shall become void at Confirmation without the need for further action. The common stock Interests representing the ownership by Horsehead of other Debtors or Non-Debtor affiliates that were not already abandoned pursuant to an order of the Court shall be deemed abandoned under this Plan. Holders of Class 3 | N/A |

Equity Interests are deemed to have rejected the Plan.

## III.
## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of interested parties including its creditors and equity interest holders. In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The consummation of a plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, the holders of claims against or interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable

a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors and the Debtors' Equity Holders to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.
## DESCRIPTION OF THE DEBTORS' BUSINESS

### A.    Background

Horsehead Industries, Inc., along with its subsidiaries, was the largest zinc producer in the United States. It operated a zinc refinery in Monaca, Pennsylvania with the capacity to produce up to 180,000 tons of zinc per year, together with a fully integrated 110-megawatt electrical power plant. Horsehead's HRD subsidiary operated recycling facilities which accepted and processed hazardous zinc wastes in Palmerton, Pennsylvania; Rockwood, Tennessee; Calumet, Illinois; and Beaumont, Texas.

### B.    Events Leading to the Filing of the Chapter 11 Cases

Despite the Debtors' successes in the fiscal year prior to the commencement of the Chapter 11 Cases, the Debtors, like all zinc producers, suffered from a worldwide decline in the market price for zinc. At around the Petition Date, the price of zinc, as quoted on the London Metals Exchange, reached a low of approximately 33¢ a pound, which at the time was the lowest price for zinc in over 100 years, on an inflation adjusted basis. With the precipitous decline in the price of zinc, the Debtors were unable to pay their debts as they became due, and had no choice but to file chapter 11 petitions for relief.

## V.
## THE CHAPTER 11 CASES

### A.    First Day Motions and Orders

On the Petition Date, the Debtors filed the following motions for which the Debtors sought expedited "first day" hearing (the "First Day Motions"):

- Debtors' Joint Application for Order Authorizing Joint Administration Pursuant to Bankruptcy Rule 1015(b) (the "Joint Administration Motion");

- Debtors' Verified Application for an Order Extending Time of the Debtors' to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Schedules Extension Motion");

- Verified Motion of the Debtors for an Order (I) Deeming Utilities Adequately Assured of Future Payment, (II) Establishing Procedures for Determining Requests for Additional Assurances Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (III) Granting Related Relief and (IV) Scheduling a Hearing Thereon (the "Utilities Motion");

- Verified Application of the Debtors for an Order Authorizing Payment of Pre-petition Salaries, Wages, Employee Benefits and Expense Reimbursement and Granting Related Relief Thereon (the "Wage Motion"); and

- Debtors' Verified Application for Order Authorizing Maintenance of Prepetition Bank Accounts, Continued Use of Existing Business Forms and Fixing Time for the Debtors to Comply with 11 U.S.C. § 345 (the "Cash Management Motion".

*The Joint Administration Motion.* The Debtors sought joint administration of the Chapter 11 Cases, and by Order dated August 19, 2002, the Court ordered the Chapter 11 Cases to be jointly administered under case number 02-14024.

*The Schedules Extension Motion.* The Debtors sought an extension of time, from September 3, 2002 to October 3, 2002, to file their Schedules, and by Order dated August 20, 2002, the Court granted the requested relief.

*The Utilities Motion.* The Debtors sought entry of an order (i) prohibiting the Debtors' utility companies from altering, refusing or discontinuing services to the Debtors; (ii) deeming the utility companies adequately assured of future performance; and (iii) establishing procedures for resolving requests for additional adequate assurance of future payment to the utility companies. By Order dated September 5, 2002, the Court granted the relief sought by the Debtors in the Utilities Motion.

*The Wage Motion*.  As is typical in chapter 11 cases, the Debtors requested authorization to: (i) pay and/or perform, as applicable, pre-petition obligations to their approximately 1,040 employees, including accrued pre-petition wages, salaries, vacation pay, holiday pay, sick pay, and severance pa; and (ii) pay all related pre-petition withholdings and payroll-related taxes.  By Order dated August 19, 2002, the Court authorized the Debtors to pay their pre-petition employee obligations and related withholdings and payroll-related taxes.

*The Cash Management Motion.*  By Order dated August 19, 2002 the Court authorized the Debtors to (a) continue using their then-existing cash management system, (b) continue using and maintaining existing bank accounts (as well as authorizing the Debtors to open and close bank accounts), and (c) continue using existing business forms.

### B.    The Official Committee of Unsecured Creditors

On August 28, 2002, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases.  The Creditors' Committee has retained Blank Rome LLP as its counsel.   On July 30, 2003, the U.S. Trustee amended the appointment of the Creditors Committee, to consist of eight members.   Thereafter, two more members resigned from the Creditors Committee.  Following various resignations, the members of the Creditors' Committee are currently as follows:

<table>
<tr><td>United Steelworkers of America<br>Five Gateway Center<br>Pittsburgh, PA 15222<br>Attn: David Jury, Esq.</td><td>Fluor Corporation<br>One Enterprise DriveThree Polaris Way<br>Aliso Viejo, CA 9265692698<br>Attn: Stephen HullJames K. Dierking, Esq.</td></tr>
</table>

11

Pittston Coal Sales Corp.[2]
P.O. Box 6300
Lebanon, VA 24266
Attn: David H. Everest, Jr.

TXU Energy Retail Company, LP
1601 Bryan Street, Ste. 12085
Dallas, TX 75201
Attn: J. William Moorse

~~Pechiney World Trade (U.S.A.)~~Alcan
International Network USA, Inc.[3]
333 Ludlow Street
Stamford, CT 06902
Attn: ~~Jeffrey~~Tom ~~Jankowski~~Sliker

H &K (Haines & Kibblehouse,
Inc.)
P.O. Box ~~1~~
~~Chalfont, PA 18914~~196
2052 Lucon Road
Skippack, PA 19474
Attn: Stephen Nelson

C.     The Debtors' Sale of Substantially All of Their Assets and the Carveout
        Settlement

On November 12, 2003, the Debtors filed a motion to sell substantially all of their assets
and assume and assign certain executory contracts and unexpired leases of nonresidential real
property (the "Sale") to Horsehead Acquisition Corp., a subsidiary of Sun Capital Partners (the
"Purchaser") in accordance with an Asset Purchase Agreement dated November 18, 2003. With
the exception of certain of the Debtors' non-core assets and preference litigation, substantially all
of the Debtors' assets were sold to the Purchaser.

The Creditors' Committee had various objections to the Sale. In partial resolution of the
Committee's objection to the Sale, the Purchaser agreed to contribute $300,000 in cash and a
$1,000,000 contingent note through Viacom to the Debtors' general unsecured creditors and the
Lenders agreed to release $300,000 for the benefit of the Debtors' unsecured creditors at such
time as the Lenders received an exit fee due to the expiration or termination of the letters of

---

[2] Upon information and belief, although Pittston Coal Sales Corp. has not formally resigned from the Creditors'
Committee, the company has ceased operation.

[3] Counsel to the Creditors' Committee has been advised by Alcan International Network USA, Inc. that it is the
successor-in-interest to Pechiney World Trade (U.S.A.), Inc.

credit assumed as part of the Sale. This settlement was accomplished in the nature of a settlement authorized by In re SPM Manufacturing Corporation, 984 F.2d 1305 (1st Cir. 1993) (the "SPM Settlement") as described in the Sale Order. The SPM Settlement is law of the case. This Disclosure Statement further ratifies the SPM Settlement authorized under the Sale Order. Counsel to the Creditors' Committee currently holds the SPM Settlement Proceeds aggregating approximately $1.9 million in a separate escrow account for the benefit of general unsecured creditors.

    **D.**     **Sales of Remaining Non-Core Assets.**

        **1.**     **Balmat Mine**. On May 6, 2003, the Debtors moved the Court for authorization to sell a zinc mining facility located in Balmat, NY (the "Balmat Mine") to St. Lawrence Zinc Company ("SLZC") [Docket No. 338]. The proposed purchase price consisted of the assumption by SLZC of certain liabilities and the obligation to pay up to $25 million based upon a complicated financial formula for "Net Free Cash Flow." The Debtors received objections to the motion from, among others, the Committee. In light of those objections, the Debtors and SLZC entered into a modified contract for the purchase and sale of the Balmat Mine. By order entered June 13, 2003 [Docket No. 412], the Court authorized the sale of the Balmat Mine to SLZC pursuant to the modified purchase and sale agreement and the sale thereafter closed. The Balmat Mine is currently closed. ~~The successor in interest to~~ SLZC has produced financial statements that show no Net Free Cash Flow from the operation of the Balmat Mine while it was operating. The Debtors and Committee disputed the accuracy of the financial reporting and maintained that cash was due to the Debtors under the terms of the purchase and sale agreement. This, however, was disputed by SLZC. The Debtors, the ~~Creditor's~~ Creditors' Committee and SLZC have reached an agreement in principle to resolve their disputes (the "Balmat Mine Settlement"). ~~A formal settlement agreement is currently being negotiated among the parties and, once finalized, will be filed on the Court's docket prior to the Confirmation Hearing~~ The Balmat Mine Settlement remains subject to execution of final documentation which will be substantially in the form annexed hereto as Exhibit "C". The Disclosure Statement shall constitute a motion, as further

described in Section VI(J)(4) hereof, for approval of the Balmat Mine Settlement pursuant to Rule 9019 of the Bankruptcy Rules and Section 1123(b)(3) of the Bankruptcy Code.

2.      **Central Lab Building**.  By motion filed on June 14, 2004 [Docket No. 755], the Debtors sought authorization to sell certain real property in Palmerton, PA known as the Central Lab Building, to an entity to be formed by Keystone Heritage Group, Inc. ("Keystone") for the purchase price of $390,000, subject to higher and better offers.  Immediately prior to the hearing to consider bidding procedures, Keystone withdrew its offer to purchase the property.  On July 25, 2005, the Debtors moved for authorization to sell the Central Lab Building to the Palmerton Area School District (the "PASD") for the purchase price of $350,000, subject to higher and better offers [Docket No. 907].  The proposed sale was subject to a 7% broker's commission.  No higher and better offer was received and, by order entered August 23, 2005 [Docket No. 921], the Court authorized the sale to the PASD. The sale of the Central Lab Building to the PASD thereafter closed.

3.      **Antelope Valley Property**.  By motion dated May 21, 2005 [Docket No. 864], the Debtors sought authorization to sell 80 acres of real property and improvements thereon located in Rosamond, CA, known as the Antelope Valley Property, to MSBH Land Corporation, for the purchase price of $270,000, subject to higher and better offers.  The Debtors' motion was granted by order dated June 3, 2005 [Docket No. 886].  No higher or better offers were received and the sale to MSBH Land Corporate thereafter closed.

4.      **Monaca Mall Property**.  By motion dated May 25, 2005 [Docket No. 865], the Debtors sought authorization to sell certain real property in Beaver, PA, known as the Monaca Mall Property, to SCB Services Corp. ("SBC"), for the purchase price of $3 million, subject to higher and better offers.   On June 15, 2005, the Court entered an order approving the sale of the Monaca Mall Property to SBC. [Docket No. 887].

Thereafter, SBC, which intended to build a retail mall on the property, requested seven extensions of the closing date for various reasons.  In connection with those extensions, which were granted by the Debtors after consultation with the Committee, SBC made $355,000 in additional non-refundable

14

deposits and paid an aggregate of $330,000 in non-refundable fees to the Debtors.

In late August, 2008, SBC advised Debtors' counsel that it would be unable to obtain necessary financing in order to close by the closing deadline of August 31, 2008 due to the well-documented credit crunch. As a result, the Debtors and the Committee, on October 1, 2008, moved the Court for authorization to close on the sale on modified terms [Docket Nos. 1063 and 1069]. Pursuant to those modified terms, the Debtors provided purchase money financing in the amount of $2.5 million to SBC in accordance with a mortgage note (the "Monaca Mortgage Note"). SBC granted the Debtors a mortgage on the property and provided the Debtors with a deed in lieu of foreclosure in the event it failed to timely pay off the purchase money mortgage. Interest on the Monaca Mortgage Note is to be paid monthly at the rate of 7.5 per annum and the Monaca Mortgage Note contains an initial maturity date of December 31, 2009. The Monaca Mortgage Note further provides SBC with the ability to purchase two six-month extensions of the maturity date for the purchase price of $50,000 each. By order entered on December 4, 2008 [Docket No. 1072], the Court authorized the closing on modified terms and, thereafter, the transaction closed. Thereafter, SBC timely exercised its first option to extend the maturity date, paying the Debtors $50,000 in connection with such exercise. As of the date hereof, SBC is current on all of its interest payments to the Debtors. The current maturity date on the Monaca Mortgage Note is June 30, 2010 subject to the ability of SBC to exercise its second (and final) 6-month extension of the maturity date. Counsel to the Debtors has been advised by SBC that it will likely exercise its second and final 6-month extension.

5.   **West Plant Property**.  On November 3, 2009, the Debtors moved to sell certain real property located in Carbon County, PA, known as the "West Plant," to Northface Development, LLC ("Northface") for the purchase price of $300,000, subject to higher and better offers [Docket No. 1095].  By order entered December 3, 2009 [Docket No. 1098], the Court authorized the sale of the West Plant to Northface and the transaction thereafter closed.

15

**E.  Preference Actions**.

The Debtors instituted various adversary proceedings seeking the avoidance and recovery of "preferential transfers" pursuant to 11 U.S.C. §§ 547 and 550. Those adversary proceedings have now been completed. The Debtors obtained several default judgments in the aggregate amount of approximately $1.327 million and remain in the process of attempting to recover monies based upon those default judgments. As of the Effective Date, the Debtors predict that they will have recovered approximately $275,000 from the default judgments and efforts to realize additional recoveries will be ongoing.

**F.  Disclosure Statement/Plan Confirmation Hearings**

On [   ], the Court entered the Disclosure Statement Order. As provided by the Disclosure Statement Order and as noted earlier in this Disclosure Statement, the hearing on confirmation of the Plan is scheduled for [   ]August 31, 2010 at 10:00 a.m..

**VI.**
**SUMMARY OF THE PLAN OF REORGANIZATION**

**A.  Introduction**

The Debtors believe that confirmation of the Plan provides the best opportunity for maximizing recoveries for their creditors. The Debtors believe that, if the Plan is not confirmed, the Debtors may be required to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In that event, Holders of Administrative Expense Claims likely will receive a significantly smaller recovery on account of their Claims and Holders of Priority Tax Claims may receive no distribution whatsoever. The following is a summary of the Plan. The Plan is attached as Exhibit A to this Disclosure Statement. The terms of the Plan govern in the event of any discrepancies with the following discussion.

16

## B. Classification and Treatment of Administrative Expense Claims, Claims and Equity Interests Under the Plan

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that a debtor agrees, or in the event of a dispute, that the court determines, that the administrative expense, claim or equity interest, including the amount, is in fact a valid obligation of, or interest in, a debtor. Section 502(a) of the Bankruptcy Code provides that a timely-filed administrative expense, claim or equity interest is automatically "allowed" unless a debtor or another party in interest objects.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in a debtor, into separate classes based upon the legal rights and obligations attached to the claim or interest. Substantially similar claims are usually but not necessarily, classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves members of multiple classes of claims and/or equity interests. As a result, under the Plan, for example, a creditor that holds a Claim based on an unsecured Claim as well as Equity Interest would have its Claim classified in Class 2 and its Equity Interest classified in Class 3. To the extent of this holder's Claim, the holder would be entitled to the voting and treatment rights that the Plan provides with respect to Class 2 and, to the extent of the holder's Equity Interest, the voting and treatment rights that the Plan provides with respect to Class 3.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the

holders of such claims, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable and contractual rights of the holders of such claims or interests or; (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements, the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes:

| Unclassified | Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall receive a cash |

| | | |
|---|---|---|
| | | payment equal to their Pro Rata Share of between $3 - 3.25 million[24] on the Effective Date or as soon as is reasonably practicable thereafter followed by periodic distributions to the extent cash proceeds, over and above necessary reserves described in the Plan, become available to the Liquidation Trustee. Such periodic payments shall continue until Allowed Administrative Expense Claims have been paid in full or all Liquidation Trust Assets become exhausted. |
| Unclassified | Priority Claims | Holders of Allowed Priority Claims shall receive a cash payment equal to their Pro Rata Share of [$250,000] on the Effective Date or as soon as is reasonably practicable thereafter. Following distributions in full of Allowed Administrative Expense Claims, Holders of Allowed Priority Claims will receive additional periodic payments, to the extent cash proceeds, over and above necessary reserves described in the Plan, become available to the Liquidation Trustee. Such periodic payments shall continue until Allowed Priority Claims have been paid in full or all Liquidation Trust Assets become exhausted |
| Class 1 | Secured Claims | Unimpaired. To the best of the Detbors Debtors' knowledge, all Secured Claims have been paid. |
| Class 2 | Unsecured Claims | Impaired. Holders of Allowed Unsecured Claims shall receive a cash payment, within 180 days after |

---

[24] As more fully described in Section 2.01 and Note 1 *supra*.

HF 5829691v.611 #12807/0001

the Effective Date, of their Pro Rata Share of the SPM Settlement Proceeds. Following distributions in full of Allowed Administrative Expense Claims and Allowed Priority Claims, Holders of Allowed Unsecured Claims will receive additional periodic payments, to the extent cash proceeds, over and above necessary reserves described in the Plan, become available to the Liquidation Trustee. Such periodic payments shall continue until Allowed Unsecured Claims have been paid in full or all Liquidation Trust Assets become exhausted.

| | | |
|---|---|---|
| Class 3 | Equity Interests | Impaired. Holders of Equity Interests shall not receive or retain any property on account of their Equity Interests. |

For purposes of computing Distributions under the Plan, Allowed Claims do not include post-petition interest.

## 1. Unclassified—Administrative Expense Claims

Administrative Expense Claims are Claims constituting costs or expenses of administration of the Chapter 11 Cases. The Debtors estimate that the total amount of outstanding Allowed Administrative Expense Claims, which consists principally of the outstanding claims of professionals and reclamation creditors, will be approximately $3.6 - 4.6 million. Such Claims include any actual and necessary costs and expenses of preserving the Debtors' estates, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business post-petition, all compensation and reimbursement

HF 5829691v.611 #12807/0001

of expenses to the extent Allowed by the Court under the Bankruptcy Code and any fees or charges assessed against the Debtors' estates owed to the office of the U.S. Trustee.

### 2.01 Administrative Expense Claims

The Plan provides that on the later to occur of (i) the Effective Date, or as soon thereafter as is practicable and (ii) the date on which such Claim shall become an Allowed Claim, the Liquidation Trustee shall either (a) pay to each Holder of an Administrative Expense Claim (x) its Pro Rata Share of between $3 - $3.25 million[35] from the Distribution Account (the "Initial Administrative Claims Distribution"); and (y) periodic cash payments from the Distribution Account (after maintaining a balance, in the sole discretion of the Liquidation Trustee, sufficient to pay all costs and expenses incurred and to be incurred by the Liquidation Trust) as set forth in the next sentence (each, a "Subsequent Administrative Claims Distribution"); or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms as may be agreed upon by and between the Holder thereof and the Liquidation Trustee.  As often as reasonably practicable thereafter, in the sole discretion of the Liquidation Trust, and after the establishment or maintenance of an appropriate reserve for Disputed Claims, the Liquidation Trust shall make Subsequent Administrative Claims Distributions from the Distribution Account to Holders of Allowed Administrative Expense Claims on a Pro Rata basis until the earlier of the date that (i) such Claims are paid in full or (ii) the Liquidation Trust Assets have been exhausted. With the exception of the Initial Administrative Claims Distribution and the Initial Priority Claims Distribution, no subsequent cash distributions shall be made by the Liquidation Trustee if the Liquidation Trustee believes, in his/her sole discretion, that the making of such periodic cash

---

[35] As more fully described in Section 2.01 and Note 1 *supra*.

HF 5829691v.611 #12807/0001

distribution would cause the funds in the Distribution Account to be insufficient to pay all of the fees, costs and expenses incurred and to be incurred by the Liquidation Trust.

Each Professional Person retained or requesting compensation in the Chapter 11 Cases shall be required to file an application for allowance of final compensation and reimbursement of expenses on account of their Professional Fee Claims in the Chapter 11 Cases on or before thirty (30) days after the Effective Date. Objections to any application made under this section shall be filed on or before a date to be fixed and determined by the Bankruptcy Court in the Confirmation Order or such other order as may be appropriate.

**There is no assurance that Administrative Expense Claims will be paid in full under the Plan. As a general matter, the Debtors currently believe that except for amounts relating to such outstanding Administrative Expense Claims, holders of administrative claims generally have otherwise been paid in full for post-petition operational and trade obligations incurred by the Debtors. Accordingly, certain parties may, in certain events, be paid a higher percentage of their total administrative claims incurred during these Chapter 11 Cases.**

**All known holders of Administrative Expense Claims have been sent an Administrative Expense Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such holder under the Plan. At the Confirmation Hearing, the Debtors will ask the Court to hold that the failure to return the Administrative Expense Claim Consent Form or to object to confirmation of the Plan by a Holder of an Administrative Expense Claim prior to the deadline set by the Court shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise**

22

requires payment in full in cash.  If an administrative Claimant objects to confirmation of the Plan asserting that it is entitled to payment in full under § 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan, in which case the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

### 2. Unclassified—Priority Claims

A Priority Claim consists of any Claim of the kind specified in section 507 of the Bankruptcy Code.  These Unsecured Claims are given a statutory priority in right of payment. The Debtors estimate that the total amount of Allowed Priority Claims as of the Effective Date will be approximately $4.7 million - $18.85 million.  The Plan provides, that on the later to occur of (i) the Effective Date, or as soon thereafter as is practicable and (ii) the date on which such Claim shall become an Allowed Claim, the Liquidation Trust shall either (a) pay to each Holder of a Priority Claim (x) its Pro Rata Share of [$250,000] (the "Initial Priority Claim Distribution"); and (y) thereafter, to the extent Holders of Allowed Administrative Expense Claims have been paid in full and based on the amount of available funds in the Distribution Account and after the establishment of an appropriate reserve for Disputed Priority Claims, make periodic cash payments as set forth in the next sentence (each, a "Subsequent Priority Claim Distribution"), or (b) satisfy and discharge such Priority Claim in accordance with such other terms as may be agreed upon by and between the Holder thereof and the Liquidation Trust.  As often as reasonably practicable following the Effective Date and so long as Holders of Allowed Administrative Expense Claims have been paid in full, in the sole discretion of the Liquidation Trust, and after the establishment or maintenance of an appropriate reserve for Disputed Claims, the Liquidation Trust shall make Subsequent Priority Claim Distributions from the Distribution Account to Holders of Allowed Priority Claims on a Pro Rata basis until the earlier of the date that (i) such Claims are paid in full or (ii) the Liquidation Trust Assets have been exhausted.

With the exception of the Initial Administrative Claims Distribution and the Initial Priority Claims Distribution, no cash distributions shall be made by the Liquidation Trustee if the Liquidation Trustee believes, in his/her sole discretion, that the making of such periodic cash distribution would cause the funds in the Distribution Account to be insufficient to pay all of the fees, costs and expenses incurred and to be incurred by the Liquidation Trust.

**There is no assurance that Priority Claims will be paid in full under the Plan. All known holders of Priority Claims have been sent an Priority Claim Consent Form pursuant to which the Debtors are seeking the agreement of such party to the treatment afforded to such holder under the Plan. At the Confirmation Hearing, the Debtors will ask the Court to hold that the failure to return the Priority Claim Consent Form or to object to confirmation by a Holder of a Priority Claim prior to any deadline set by the Court shall be deemed to be such Holder's consent and agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9), which otherwise requires payment in full in cash. If a holder of a Priority Claim objects to confirmation of the Plan asserting that it is entitled to payment in full under § 1129(a)(9) of the Bankruptcy Code, the Debtors may not be able to confirm the Plan, in which case the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.**

      **3.**      **Class 1—Secured Claims (Unimpaired; therefore, deemed to have accepted the Plan and not entitled to vote)**

The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Class 1 Claims. Unless otherwise agreed to by the Holder of an Allowed Class 1 Claim and the Debtors or the Liquidation Trustee, or as otherwise addressed in prior Court orders, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, one of the following treatments, as soon as practicable after the Effective Date in the sole

discretion of the Liquidation Trustee: (i) the ~~return of such Holder's collateral; (ii) the~~ payment in cash equal to the amount of such Allowed Secured Claim; or (~~iii~~ii) the payment of such other distributions as necessary to satisfy the requirements of the Bankruptcy Code. The Debtors estimate that there are no outstanding Secured Claims.

### 4. Class 2—Unsecured Claims (Impaired; therefore, entitled to vote to accept or reject the Plan)

On the Effective Date, counsel to the Creditors' Committee shall transfer the SPM Settlement Proceeds to the Liquidation Trustee. Within 180 days of the Effective Date, the Holders of Allowed Class 2 Claims shall receive a cash payment equal to their Pro Rata Share of the SPM Settlement Proceeds (the "SPM Distribution").

Thereafter, to the extent that all Holders of Allowed Administrative Expense Claims and Allowed Priority Claims have been paid in full and based on the amount of available funds in the Distribution Account and after the establishment of an appropriate reserve for Disputed Unsecured Claims, the Liquidation Trustee shall either (a) make periodic cash payments as set forth in the next sentence (each, a "Subsequent Unsecured Claims Distribution"), or (b) satisfy and discharge such Unsecured Claim in accordance with such other terms as may be agreed upon by and between the Holder thereof and the Liquidation Trust. As often as reasonably practicable following the Effective Date and so long as Holders of all Allowed Administrative Expense Claims and Allowed Priority Claims have been paid in full, in the sole discretion of the Liquidation Trust, and after the establishment or maintenance of an appropriate reserve for Disputed Claims, the Liquidation Trust shall make Subsequent Unsecured Claims Distributions from the Distribution Account to Holders of Allowed Unsecured Claims on a Pro Rata basis until the earlier of the date that (i) such Claims are paid in full or (ii) the Liquidation Trust Assets have been exhausted. With the exception of the Initial Administrative Claims Distribution, the

Initial Priority Claims Distribution and the SPM Distribution, no cash distributions shall be made by the Liquidation Trustee if the Liquidation Trustee believes, in his/her sole discretion, that the making of such periodic cash distribution would cause the funds in the Distribution Account to be insufficient to pay all of the fees, costs and expenses incurred and to be incurred by the Liquidation Trust.

5. **Class 3—Equity Interests (Impaired; deemed to have rejected the Plan)**

The holders of Allowed Class 3 Interests shall receive nothing under this Plan. All existing shares of Equity Interests shall become void at Confirmation without the need for further action. The common stock Interests representing the ownership by Horsehead of other Debtors or Non-Debtor affiliates that were not already abandoned pursuant to an order of the Court shall be deemed abandoned under this Plan.

C. **Means of Distributions Under the Plan and Implementation**

1. **Liquidation of Debtors' Assets**

The Debtors previously determined, in the discharge of their statutory duties under the Bankruptcy Code, that it was in the best interests of the Debtors, Lenders, and Creditors that the Debtors' business and substantially all of their assets be liquidated in an orderly fashion, with the net proceeds of such disposition being distributed in accordance with the Bankruptcy Code, prior Orders of the Court and the terms and provisions of this Plan. Accordingly, the Debtors, with Court approval documented by the Sale Order, sold substantially all of their assets, and assumed and assigned or rejected substantially all of their unexpired leases, licenses and other executory contracts pursuant to the terms of the Asset Purchase Agreement. Subsequently, the Debtors, as set forth above, sold several non-core assets that where excluded from the Sale to Acquisition and utilized the proceeds to pay certain administrative costs of the Debtors' Estates. As of the

Effective Date, it is anticipated that the Liquidation Trust will be comprised of the Liquidation Trust Assets. As of the Effective Date, these Liquidation Trust Assets shall be transferred to the Liquidation Trust.

As soon as practicable after the Liquidation Trustee has liquidated all of the Liquidation Trust Assets and completed all distributions provided in the Plan, but no later than the 5th anniversary of the Effective Date, the Liquidation Trustee will effectuate the dissolution of the Liquidation Trust.

All of the Debtors' assets, powers, rights ~~and~~, duties, claims and causes of action shall be transferred to the Liquidation Trust on the Effective Date. In addition, on the Effective Date, the Creditors' Committee shall transfer to the Liquidation Trust the SPM Settlement Proceeds for distributions to holders of Allowed Unsecured Claims.

The Debtors estimate that as of the Effective Date they will have available for distribution approximately $3 - $3.5 million comprised of cash from pre-confirmation sales of non-core assets, the funds held in an escrow account by the Debtors' counsel in the amount of $800,000 plus accrued interest, ~~pending resolution or~~subject to Court ~~determination of a dispute related to Blackstone, L.P.'s request for a bonus restructuring fee (the "~~approval of the Blackstone ~~Reserve Account")~~Fee Resolution, proceeds from the Balmat Mine Settlement, interest received on the Monaca Mall Note and proceeds from preference recoveries.

The Debtors estimate that Allowed Claims, as of the Effective Date, will be approximately as follows:

Administrative Expense Claims: $3.6 million - $4.6 million.

Priority Claims: $4.7 million - $18.85 million

Secured Claims: $0

Unsecured Claims:  According to the Debtors' books and records, Unsecured Claims were scheduled in the amount of $30,545,395.  Numerous general unsecured proofs of claim were submitted in these cases.  The Debtors estimate that total Allowed Unsecured Claims will be between $50 million and $450 million.[6]  The Liquidation Trustee shall conduct an analysis of the proofs of claim filed in these cases and, where appropriate, object to the Allowance of Unsecured Claims.

### 2.    Substantive Consolidation

The Disclosure Statement shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases.  If any objection is timely filed, a hearing with respect to the substantive consolidation of the assets and liabilities of the Estates and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing. Pursuant to the Confirmation Order (i) all assets and liabilities of the Debtors will be deemed to be merged, (ii) the obligations of each Debtor will be deemed to be obligations of all Debtors, (iii) any Claims filed or scheduled in connection with any such obligations will be deemed Claims against all Debtors, as substantively consolidated, (iv) all transfers, disbursements and distributions made by any Debtor will be deemed to be made by all of the Debtors, (v) any Debtor's guarantees of the obligations of another Debtor shall be deemed eliminated so that any Claim against a Debtor and any guarantee thereof executed by another Debtor shall be deemed to be one obligation of all Debtors; and (vi) intercompany claims between the Debtors will be eliminated.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution of such Class without regard to which

---

[6] These claims include claims asserted by the Internal Revenue Service ("IRS") in the amount of $336 million.  The Debtors' and the Creditors' Committee will attempt to resolve these claims with the IRS prior to the Effective Date.

Debtor was originally liable for such Claim.  The substantive consolidation of the Debtors shall not affect or impair any rights, claims or defenses of any of the separate Debtors, all of which shall be vested in the Liquidation Trust as of the Effective Date.

Substantive consolidation is justified where (i) creditors dealt with entities as a "single economic unit and did not rely on their separate identity in extending credit", or (ii) "the time and expense necessary even to attempt to unscramble [the Debtors' assets] is so substantial as to threaten the realization of any net assets for all the creditors…or where no accurate identification and allocation of assets is possible."  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518-519 (2d Cir. 1988).  In determining whether substantive consolidation is warranted under the first factor, "courts will consider a number factors, including whether the entities share costs or obligations; fail to observe corporate formalities; or … fail to act independently." *In re Source Enterprises, Inc.*, 392 B.R. 541, 552 (Bankr. S.D.N.Y. 2008). "A *prima facie* case for [substantive consolidation] exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005); *Soviero v. Franklin Nat. Bank*, 328 F.2d 446 (2d Cir. 1964) (consolidation proper where creditors dealt with debtor and its affiliates as if they were one corporation and did not rely on credit of any separate entity).

Here, substantive consolidation is justified for a number of reasons:

(i)	before the filing of the bankruptcy petitions, creditors dealt with and looked to the Debtors as a single economic unit and relied on the entire organization's creditworthiness as a whole;

(ii)     each of the Debtors were liable on the organization's pre- and post-petition secured indebtedness;

(iii)    each of the Debtors were under common management;

(iv)     the Debtors freely transferred cash from one Debtor to another based upon need without expectation for repayment of any such cash transfer;

(v)      the Debtors filed consolidated tax returns;

(vi)     the Debtors filed consolidated schedules of assets and liabilities;

(vii)    the unwinding of the various inter-company claims would be too costly and time consuming to "unscramble" at this juncture;

(viii)   following the Sale in 2003, all cash was maintained in a single account without any allocation or segregation of funds according to any specific Debtor Entity;

(ix)     the funding for all payments to creditors of each individual Entity was made through a single account;

(x)      all funds of the Debtors are commingled into a single account;

(xi)     the SPM Settlement Proceeds are being held by the Creditors' Committee, do not belong to any one of the Debtors, are not allocated among the Debtors, and under the terms of the SPM Settlement Order, were to be used to pay all of the Debtors' creditors.

~~For all of these reasons, the Debtors' assets have become hopelessly entangled.  It would now be impossible and prohibitively expensive to attempt to identify and allocate these assets. Therefore, the Debtors and the Creditors' Committee have determined that substantive consolidation is necessary for the benefit all creditors.~~

For all of these reasons, the Debtors have satisfied both tests under *Augie/Restivo* for determining when substantive consolidation is warranted.  Therefore, the Debtors and the

Creditors' Committee have determined that substantive consolidation is necessary and appropriate for the benefit of all creditors.

### 3. Settlements Critical to Implementation of the Plan

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtors or any of them, arising out of, relating to, or in connection with, the business or affairs of, or transactions with, the Debtors.

Bankruptcy Rule 9019 provides the mechanism for Court approval of compromises and settlements. The Rule provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Settlements and compromises are "a normal part of the process of reorganization..." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005). The Supreme Court has recognized that "[i]n administering a reorganization proceeding in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." In re Protective Committee for Independent Stockholders of TMT Ferry, Inc. v Anderson, 390 U.S. 414, 424 (1986). Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and

equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").

In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted). The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002). The Bankruptcy Court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Commc'ns, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities'." In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvas the issues' to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia Comc'ns, 327 B.R. at 159 (quoting

W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3D 600 (2d Cir. 1994).

### (a) The Balmat Mine Settlement

The Disclosure Statement shall constitute a motion, pursuant to Bankruptcy Rule 9019, for Court approval of the Balmat Mine Settlement. Here, the terms of the Balmat Mine Settlement are fair, reasonable and in the best interests of the Estates. Moreover, the consummation of the Balmat Mine Settlement is critical to the occurrence of the Effective Date and the implementation of the Plan.

As set forth in Section V(D)(1) hereof, in May 2003, the Debtors entered into a purchase and sale agreement with SLZC (as amended and dated June 10, 2003, the "Agreement") under which it agreed to sell to SLZC real property and attendant other assets comprising a zinc mine located in Balmat, New York. The Agreement obligates SLZC to pay consideration to the Debtors annually 30% of "Net Free Cash Flow" generated by the mine facility. The aggregate amount of annual payments to be made by SLZC are subject to a "Cap" which, due to the occurrence of certain conditions, is now $25,000,000. The definition and calculation of Net Free Cash Flow has proven to be problematic such that even when the Balmat Mine Facility was open and operating (it is currently closed), SLZC's calculations of Net Free Cash Flow resulted in no annual payments to the Debtors. Certain disputes have arisen between the parties regarding SLZC's calculations of "Net Free Cash Flow" and the parties, with the assistance of counsel to the Creditors Committee have, over an extended period of time, engaged in extensive discussions in an attempt to resolve their disputes. As a result of these discussions, an agreement in principle was reached whereby SLCZ will "buy out" its remaining payment obligations under the

HF 5829691v.611 #12807/0001

Agreement and the Debtors will receive a lump sum cash payment of $2.5 million in lieu of the potential receipt of annual payments over several years.  The Balmat Mine Settlement remains subject to execution of final documentation which will be substantially in the form annexed hereto as Exhibit "C".

The Debtors and the Creditors' Committee have determined that the Balmat Mine Settlement is beneficial to the Estates in a number of ways.  First, although the Debtors are currently entitled to receive up to $25 million in future cash payments from SLZC depending upon future calculations of "Net Free Cash Flow," the Balmat Mine is currently closed and not producing *any* cash flow.  Accordingly, there is no guarantee that the Debtors would receive any future cash payments from SLZC absent the Balmat Mine Settlement.  Further, even if the Balmat Mine were to be reopened, future payments from SLZC, if any, would not be due for months, if not years, depending on future calculations of "Net Free Cash Flow."  Conversely, the $2.5 million payment due under the Balmat Mine Settlement will provide the Debtors with near immediate liquidity which is crucial to the ability of the Liquidation Trustee to make the Distributions required under the Plan.  Moreover, although the Debtors and Creditors' Committee have disputed SLZC's prior calculations of "Net Free Cash Flow" during the period that the Balmat Mine was open and operating, there can be no assurance that the Debtors would prevail in any litigation with SLZC regarding those or any future calculations.  Therefore, given the clear benefits to the Estates, the Debtors believe that the proposed Balmat Mine Settlement falls well above the "lowest point in the range of reasonableness" required for approval of a settlement under Bankruptcy Rule 9019.  The Balmat Mine Settlement, therefore, should be approved.

**(b) Resolution of Blackstone Restructuring Fee**

By this Disclosure Statement, the Debtors are providing notice of the Blackstone Fee Resolution which is subject to review and approval of the Court at the hearing to consider Blackstone L.P.'s final fee application. The Blackstone Fee Resolution is also critical to occurrence of the Effective Date and to the implementation of the Plan. Blackstone was retained in these cases to represent the Debtors as their financial advisors in order to assist the Debtors with operational issues and to develop an exit plan from chapter 11. Blackstone was entitled to $150,000 per month for their financial advisory services. Blackstone was also entitled to a Restructuring Fee of $1,000,000 (the "Restructuring Fee") in the event of a "Restructuring." Blackstone filed a Final Application in April 2004, after the Sale, seeking its outstanding monthly fees and the Restructuring Fee. The Debtors and the Committee advised Blackstone that they had various objections to the payment of any Restructuring Fee to Blackstone.

Following the Sale, certain disputes arose regarding a "carveout" from the secured lenders' collateral to pay professionals retained in these cases. On July 15, 2004, the Court entered an order settling the carveout dispute (the "Carveout Settlement Order") between the Debtors' secured lenders, the Debtors, and the estates' professionals and providing for funding of the Debtors' estates through liquidation of non-core assets. The Carveout Settlement resulted in a prepayment by the Sale purchaser of $2.3 million of a $4.5 million Estate Note received by the Debtors under the Sale, leaving $2.2 million owing on the Estate Note in favor of the Debtors' estates (the "Remaining Estate Note"). Thereafter, on August 9, 2005, the Court entered an order approving a settlement and stipulation pursuant to which the terms of the Remaining Estate Note were refinanced (the "Refinancing"). After accounting for certain offsets pursuant to the Refinancing, the balance of Remaining Estate Note was paid in full to the Debtors' estates.

HF 5829691v.611 #12807/0001

Pursuant to the Carveout Settlement Order, proceeds of the Estate Note, as well as certain amounts expected to be recovered from the sale of non-core assets and avoidance actions, were to be deposited in an operating account established by Debtors' counsel, for the payment of, *inter alia*, past, current and future professional fees and expenses. However, the Carveout Settlement Order also provided that $800,000 was to be deposited in a separate escrow account (i.e. the Blackstone Reserve Account) to cover 80% of the Restructuring Fee to be maintained by Debtors' counsel until a determination is made by the Court with respect to the Restructuring Fee. Further, according to the Carveout Settlement Order, in the event the Restructuring Fee was not allowed in part or in full by the Court, the monies in the Blackstone Reserve Account would be distributed pro rata to the estates' professionals on account of unpaid fees and expenses.

Counsel to the Debtors and the Creditors Committee have engaged in extensive discussions with Blackstone to resolve the Blackstone Restructuring Fee issue, including the release of funds from the Blackstone Reserve Account which funds would be utilized to make Distributions to holders of all Allowed Administrative Expense Claims rather than being specifically earmarked for the payment of Blackstone's Restructuring Fee. As a result of those discussions, Blackstone has agreed to the release of the funds from the Blackstone Reserve Account. The release of those funds provides the liquidity necessary to make the Distributions contemplated under the Plan. In light of Blackstone's agreement to release the funds held in the Blackstone Reserve Account, the Debtors and Committee have agreed not to object to Blackstone's request for allowance of the Restructuring Fee. Allowance of Blackstone's Restructuring Fee, as well all of Blackstone's compensation, are subject to the appropriate application to the Court and entry of a Final Order awarding such fees. In the event that the Blackstone Fee Resolution is not approved by the Court, Blackstone, the Debtors and the

36

Creditors' Committee reserve all rights.  The discussion of the Blackstone Fee Resolution is included herein solely to provide as much notice as possible to interested parties.

### 4. 3. Officers and Directors of the Debtors

Immediately after the Effective Date, all officers and directors of the Debtors shall be deemed to have resigned.  The Liquidation Trustee may retain the Debtors current Liquidation Officer, Ronald J. Statile.

### 5. 4. Formation of Liquidation Trust

On or before the Effective Date, the Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust in accordance with the Plan, thereby allowing the Liquidation Trust to stand in the shoes of the Debtors and their estates with respect to all of the Debtors' and their estates' rights and interests.  A copy of the Liquidation Trust agreementAgreement shall be filed with the Court prior to the Confirmation Hearing.  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors shall be deemed to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, including, without limitation, all of the Debtors' assets, powers, rights, duties, claims and powerscauses of action, including those necessary to commence and prosecute actions under Article V of the Bankruptcy Code and to object to Claims, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims and Allowed Equity Interests of the Holders as set forth in the Plan and the Plan Expenses of the Liquidation Trust as provided in the Liquidation Trust Agreement.  As such, the Liquidation Trustee shall have succeeded to the rights of the Debtors in the Liquidation Trust Assets.

HF 5829691v.611 #12807/0001

The Liquidation Trustee shall succeed to the rights of the Debtors under the Asset Purchase Agreement in all respects, including the retrieval of copies of all necessary books and records purchased by Acquisition under the Asset Purchase Agreement, to the extent necessary to administer the Chapter 11 Cases and implement the Plan.

Except as otherwise provided in the Plan or the Liquidation Trust Agreement, the Liquidation Trustee may compromise or settle any Claims, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### 6. ~~5.~~ Treatment of Liquidation Trust for Federal Income Purposes; No Successor-in-Interest

The Liquidation Trust shall be established for the primary purpose of liquidating their assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the holders of Allowed Claims and not unduly prolong their duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Beneficiaries) shall treat the transfer of the Liquidation Trust Assets

38

by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims of Beneficiaries entitled to distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to (i) invest such Liquidation Trust Assets (pending distributions in accordance with the Plan) in the Distribution Account in accordance with Section 8.01 of the Plan, or (ii) deposit such assets in demand deposit or certificates of deposit at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

Subject to the provisions of the Plan, the Liquidation Trustee shall distribute to the Beneficiaries all net cash income plus all net cash proceeds from the liquidation of the Liquidation Trust Assets (including as Cash for this purpose, all cash equivalents) at such time intervals as decided by the Liquidation Trustee in their discretion, pursuant to the terms of the Plan. The Liquidation Trustee may, in their sole discretion, cause the Liquidation Trust to retain

HF 5829691v.611 #12807/0001

an amount of net cash proceeds or net cash income reasonably necessary to maintain the value of their assets or to meet Claims and contingent liabilities (including Disputed Claims).

The Liquidation Trustee shall require any Beneficiary or other distributee to furnish to the Liquidation Trustee in writing his or their Employer or Taxpayer Identification Number as assigned by the Internal Revenue Service and the Liquidation Trustee may condition any distribution to any Beneficiary or other distributee upon receipt of such identification number.

### 7. ~~6.~~ Appointment of the Liquidation Trustee

The Trustee for the Liquidation Trust shall be designated by the Creditors' Committee. The Creditors' Committee will designate the Liquidation Trustee within 5 days of the Confirmation Hearing.

On the Effective Date, the Liquidation Trustee shall serve as trustee of the Liquidation Trust, and shall have all assets, powers, rights ~~and,~~ duties, claims and causes of action of a debtor in and to the Liquidation Trust Assets. Among other things, the Liquidation Trustee shall (i) hold and administer the Liquidation Trust Assets, (ii) have the power and authority to retain, as an expense of the Liquidation Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidation Trustee hereunder or in the Liquidation Trust Agreement, (iii) make distributions to the Beneficiaries as provided in the Liquidation Trust Agreement, (iv) pursue or otherwise settle pending Avoidance Actions or any other claim or cause of action of the Liquidation Trust, and (v) have the right to receive reasonable compensation for performing services as Liquidation Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidation Trustee in performing the duties and responsibilities required under the Plan and the Liquidation Trust Agreement. In the event the Liquidation Trustee is no longer willing or able to serve as trustee, or is otherwise removed pursuant to the

terms of the Liquidation Trust Agreement, then the successor shall be appointed by the majority vote of the members of the Committee as of the Effective Date, or as otherwise determined by the Bankruptcy Court or the Liquidation Trust Agreement, and notice of the appointment of such Liquidation Trustee shall be filed with the Bankruptcy Court.

### **8.** ~~7.~~ Retention of Professionals and Other Persons

The Liquidation Trustee shall be authorized to retain and pay professionals and such other Persons the Liquidation Trustee determines in his sole discretion to be necessary to carry out his duties and responsibilities, or otherwise to accomplish the purposes of the Plan, the Confirmation Order and the Liquidation Trust Agreement. The Liquidation Trustee shall have the right to pay the professionals from the Liquidation Trust Assets without further order of the Bankruptcy Court.

### **9.** ~~8.~~ Liquidation Trustee Standard of Care; Exculpation

**Neither the Liquidation Trustee, nor any director, officer, affiliate, employee, employer, professional, attorney, agent or representative of the Liquidation Trust shall be personally liable, in connection with affairs of the Liquidation Trust, to any claimholder or Beneficiary of the Liquidation Trust, or any other Person, except for such acts or omissions which shall constitute willful misconduct or gross negligence. The Liquidation Trustee is entitled to rely upon and shall have no liability in relying upon the advice of professionals retained by the Liquidation Trust. Any Person asserting a claim against the Liquidation Trust for the expenses of the Liquidation Trust, shall look only to the Liquidation Trust Assets to satisfy any such expense incurred by the Liquidation Trust, the Liquidation Trustee, or other Persons employed or retained by the Liquidation Trust to carry out the terms of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.**

HF 5829691v.~~6~~11 #12807/0001

### 10. ~~9.~~ Termination of the Liquidation Trust

The Liquidation Trust will terminate as soon as practicable, but in no event later than the fifth (5th) anniversary of the Effective Date; *provided*, *however*, that, on or prior to the date of such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust for a finite period, if such an extension is necessary to liquidate the Liquidation Trust Assets or for other good cause. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is requested prior to the expiration of each extended term; *provided*, *however*, that the Liquidation Trustee determines that any further extension would not adversely affect the status of the Liquidation Trust as a grantor trust for federal income tax purposes.

### 11. ~~10.~~ Termination of Liquidation Trustee

The duties, responsibilities and powers of the Liquidation Trustee shall terminate in accordance with the terms of the Liquidation Trust Agreement.

### 12. ~~11.~~ Indemnification

**With respect to the Liquidation Trustee, the Trust shall (i) reimburse the Liquidation Trustee for all reasonable expenses incurred by him in connection with the execution and performance of his rights and duties hereunder (including reasonable fees and expenses of counsel and other experts); (ii) indemnify, defend and hold harmless the Liquidation Trustee (in both his individual and trustee capacities) and the officers, directors, employees and agents of the Liquidation Trustee (collectively, including the Liquidation Trustee in their individual capacity, the "Indemnified Persons") from and against any and all losses, damages, liabilities, claims, actions, suit, costs, expenses, disbursements (including the reasonable fees and expenses of counsel), taxes and penalties of any kind and nature whatsoever, to the extent that such expenses arise out of or are**

42

imposed upon or asserted at any time against one or more Indemnified Persons with respect to the performance of this Agreement, the creation, operation, administration or termination of the Liquidation Trust, or the transactions contemplated hereby (collectively, "Indemnified Expenses"); and (iii) advance to each Indemnified Person Indemnified Expenses (including reasonable legal fees) incurred by such Indemnified Person in defending any claim, demand, action, suit or proceeding, prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Liquidation Trust of a written request therefor and of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall ultimately be determined that the Indemnified Person is not entitled to be indemnified therefor; provided however, that notwithstanding anything in the Liquidation Trust to the contrary, the Liquidation Trust shall not be required to reimburse the Liquidation Trustee for any expenses, indemnify an Indemnified Person for Indemnified Expenses, or advance any Indemnified Expenses to an Indemnified Person, to the extent any such obligation arose or was the result of the willful misconduct or gross negligence of such Indemnified Person.

### 13. 12. Preservation of Records and Documents

Pursuant to the Asset Purchase Agreement, BuyerAcquisition is required to preserve and provide access to the business records of the Debtors covering the period prior to the closing on the Asset Purchase Agreement. BuyerAcquisition shall preserve and provide access to the business records to the Liquidation Trustee or his agents as required under the Asset Purchase Agreement.

### 14. 13. Corporate Action

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and

approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors. After the Effective Date, the Debtors shall dissolve or otherwise terminate their existence in accordance with applicable law.

### 15. ~~14.~~ Cancellation of Notes, Instruments, Debentures and Equity Securities

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, certificates and other documents evidencing Claims and all Equity Interests in the Debtors shall be canceled and deemed terminated.

### 16. ~~15.~~ Effect of Appeals

Unless the Confirmation Order is stayed pending appeal, at the option of the Debtors and the Creditors' Committee, the Plan may be consummated notwithstanding the pendency of an appeal from the Confirmation Order or the timely service or filing of a motion under Bankruptcy Rule 7052, 8002, 8003, 8015, 9023, or 9024.

### D. Means of Distribution and Funding

#### 1. Distribution Account

The Liquidation Trustee shall make all Distributions required under the Plan. On or as soon as practicable after the Effective Date, the Liquidation Trustee shall (a) create and fund the Distribution Account, and (b) periodically deposit the Liquidation Trust Assets into the Distribution Account to implement the distribution provisions of the Plan. The Distribution Account shall contain an amount of Cash deemed sufficient by the Liquidation Trustee for the payment of all accrued and anticipated Plan Expenses. The Liquidation Trustee shall be authorized to transfer funds among sub-accounts, if sub-accounts are created, as necessary to replenish any sub-accounts as and when distributions are made to Creditors. Unless otherwise provided in the Confirmation Order or any other order of the Court, the Distribution Account

shall be invested by the Liquidation Trustee in a manner consistent with the provisions of section 345(a) of the Bankruptcy Code.

### 2. Collection of Liquidation Trust Assets

From and after the Effective Date, the Liquidation Trustee shall deposit the Liquidation Trust Assets into the Distribution Account, marshal any remaining assets of the Debtors and shall deposit the SPM Settlement Proceeds into a separate bank account not to be commingled with the Liquidation Trust Assets. All proceeds realized from the foregoing shall be promptly deposited into the Distribution Account and such funds shall be held in trust by the Liquidation Trustee. Except as otherwise provided in this Plan and the Confirmation Order, such Liquidation Trust Assets shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan. To the extent required to make distributions to the holders of Allowed Claims, fund the Distribution Account, pay Plan Expenses, and otherwise implement the Plan, all Liquidation Trust Assets shall be held in trust by the Liquidation Trustee.

### 3. Payment of Plan Expenses

Any party which desires to receive notice of intended Distributions by the Liquidation Trustee must file and serve upon the Liquidation Trustee a request to receive such notice. All Plan Expenses may be paid by the Liquidation Trustee from the Distribution Account upon ten (10) days' prior written notice to any such parties ("Distribution Notice Parties"), but without further notice to Creditors or holders of Interests, or approval of the Bankruptcy Court. Any disputes concerning the payment of Plan Expenses shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to any objecting party.

### 4. Distribution of Liquidation Trust Assets

The Liquidation Trustee shall make all Distributions required under the Plan, including Distributions to holders of Allowed Unsecured Claims from the SPM Settlement Proceeds.

Subject to the payment of Plan Expenses, the Liquidation Trust Assets shall be distributed by the Liquidation Trustee to the holders of Allowed Claims after Administrative Expense Claims and Priority Claims have been paid in accordance the Plan. Pursuant to Article X of the Plan, no payments or Distributions shall be made by the Liquidation Trustee on account of Disputed Claims unless and to the extent such Claims become Allowed Claims. The Liquidation Trust Assets allocated to Disputed Claims will not be distributed but will be held in the Distribution Account by the Liquidation Trustee in accordance with the Plan pending resolution of such Disputed Claims.

### 5. Distribution Powers

The Liquidation Trustee shall be empowered to (i) take all steps and execute all instruments and documents necessary to effectuate the disbursements to be made under the Plan; (ii) make Distributions contemplated by the Plan; (iii) comply with the Plan and the obligations thereunder; (iv) employ, retain, or replace professionals to represent it with respect to its responsibilities; and (v) exercise such other powers as may be vested in it pursuant to order of the Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

### 6. Distribution Procedures

Except as otherwise agreed by the holder of a particular Claim, or as provided in the Plan, all amounts to be paid by the Liquidation Trustee under the Plan shall be distributed in such amounts and at such times as is reasonably prudent. On or as soon as practicable after the Effective Date, the Liquidation Trustee shall marshal all then-available Liquidation Trust Assets, and establish and fund the Distribution Account pursuant to Section 8.01 of the Plan. After payment of Plan Expenses, the Liquidation Trustee shall make interim and/or final distributions

46

of Liquidation Trust Assets from the Distribution Account in accordance with the provisions of the Plan.

### 7.      Date of Distributions

Unless otherwise provided in the Plan, the initial Distributions to be made thereunder shall be made on the Effective Date or as soon as practicable thereafter and deemed made on the Effective Date.  In the event that any Distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such Distribution or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.      Delivery of Distributions

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be forwarded to the address of such holder as set forth on the Schedules, or the books of the Debtors, unless the Debtors have been notified in writing of a change of address, including, without limitation, by filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected in the Schedules or records of the Debtors.

### 9.      Fixing of Claims

Commencing upon the Effective Date, the Liquidation Trustee shall be authorized and directed to distribute the amounts required under the Plan to the holders of Allowed Claims according to the provisions of the Plan.  Upon the Effective Date, subject to appropriate objections by the Liquidation Trustee, all Claims ~~of~~against the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Liquidation Trust shall have no further obligation on account of any Claims or Interests except as set forth in the Plan.

### 10. Unclaimed Distributions

In the event that any Distribution to any holder is returned as undeliverable, the Liquidation Trustee shall use reasonable efforts to determine the current address of such holder, but no Distribution to such holder shall be made unless and until the Liquidation Trustee has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 90 days from the date of the attempted Distribution. After such dates, all unclaimed property or interests in property shall be maintained in or deposited into the Distribution Account, and the Claim of any other holder of such property or interest in property shall be forever barred.

### 11. Fractional Dollars

No fractional Dollars shall be distributed. For purposes of any Distribution, fractional dollars shall be rounded up or down to the nearest whole dollar amount.

### 12. Setoffs and Recoupment

The Debtors or the Liquidation Trustee may, but shall not be required to, set off against, or recoup from, any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtors may have against the Claimant, but neither the failure to do so nor allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the Claimant.

### 13. DeMinimus Payments

Notwithstanding any other provision of the Plan, Distributions of less than $20.00 need not be made by the Liquidation Trustee on account of any Allowed Claim; provided that Distributions that would otherwise be made but for this provision shall carry over until the next date of a Distribution until the cumulative amount to which the holder of such Allowed Claim is

48

entitled is more than $20.00, at which time the cumulative amount of such Distributions shall be paid to such holder.

### E. Procedures for Resolving Disputed Claims Under the Plan

#### 1. The Deadline for Objections to Claims

Objections to Claims (other than Professional Fee Claims) shall be filed by the Debtors or the Liquidation Trustee with the Bankruptcy Court and served upon each holder of each of the Claims to which objections are made no later than 120 days after the Effective Date, except that unless otherwise extended by order of the Bankruptcy Court, the Debtors or the Liquidation Trustee may file an objection to the allowance of any Claim filed resulting from the rejection of an Executory Contract on the later of 120 days after the Effective Date or within 30 days after the filing of such Claim and service of a copy of such Claim.

#### 2. Disputed Claims

Unless otherwise ordered by the Bankruptcy Court, prior to the Effective Date, the Debtors and the Creditors' Committee may file all objections to Claims that are the subject of proofs of Claim or requests for payment filed with the Bankruptcy Court (other than Professional Fee Claims), and serve such objections upon the holder of the Claim, as to which the objection is made. Except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Liquidation Trustee shall, after the Effective Date, have the exclusive right to make and file objections to Claims. All objections shall be litigated to Final Order, provided, however, that the Liquidation Trustee, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections without approval of the Bankruptcy Court. Notwithstanding the foregoing, the Liquidation Trustee shall not have authority to settle or shall withdraw any objection to a Claim in an amount greater than $50,000 except after giving ten (10) days' prior written notice and opportunity to object to any party in

HF 5829691v.611 #12807/0001

interest specifically requesting post-confirmation notice from the Liquidation Trustee. Any disputes concerning the settlement or withdrawal of any Objection to a Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

### 3. Reserve Provisions for Disputed Claims

The Liquidation Trustee shall implement the following procedures with respect to the allocation and distribution of Cash in the Distribution Account to the holders of Disputed Claims that become Allowed Claims:

(a) Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be held by the Liquidation Trustee in the Distribution Account in an amount equal to such Distributions as would otherwise be made to the holders of such Claims based on the amount of Disputed Claims.

(b) For the purposes of effectuating the provisions of this section, the Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan. In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court or the Liquidation Trustee may determine the portion of the Disputed Claim to be reserved on account of such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Liquidation Trustee and the ˉholder thereof.

(c) When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of the Plan, Cash equal to a Pro Rata Share of the Cash paid to holders of Allowed Claims in the same Class as of the time such Distribution is made.

(d) Interim Distributions may be made from time to time to the holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims; provided that an amount sufficient to pay all Disputed Claims as if they were Allowed Claims shall first be maintained in the Distribution Account.

(e) No holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim. In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Liquidation Trustee or the Distribution Account: (x) any payment which is

greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to this section, or (y) interest or other compensation for delays in distribution. In no event shall the Liquidation Trustee have any responsibility or liability for any loss to or of any amount reserved under the Plan.

(f) To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the portion of the amount reserved for such Disputed Claim, then the resulting surplus Cash shall be retained in the Distribution Account and distributed as provided under the Plan.

(g) Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed shall be deemed to have been made on the Effective Date.

## 4. Disputed Payments

In the event of any dispute between and among Creditors as to the right of any entity to receive or retain any payment or Distribution to be made to such entity under the Plan, the Liquidation Trustee may, in lieu of making such payment or distribution to such entity, instead hold such payment or Distribution until the disposition thereof shall be determined by the Bankruptcy Court.

## 5. No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of an Administrative Expense Claim, Priority Claim, or a Claim is a Disputed Claim, the payment or Distribution provided hereunder shall be made only with respect to the undisputed portion on account of such Claim.

## 6. Voting Rights of Holders of Disputed Claims

Pursuant to Bankruptcy Rule 3018(a), a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes shall be without prejudice to the holders of such Disputed Claim seeking to have such Disputed Claim Allowed

51

for purposes of Distribution under the Plan. Any Claim filed by a claimant for an unliquidated amount will be counted for purposes of voting on the Plan as $1.00.

### F. Treatment of Executory Contracts and Unexpired Leases

#### 1. Rejected If Not Assumed

The Plan constitutes and incorporates a motion by the Debtors to reject, and the Confirmation Order shall be deemed to be an order authorizing the rejection of, all Executory Contracts (including unexpired leases) to which the Debtors are a party and which have not on or before the Confirmation Date been (i) previously rejected by Bankruptcy Court order or by operation of law, (ii) previously expressly assumed pursuant to an order (including the Sale Order) of the Bankruptcy Court prior to the Confirmation Date, or (iii) included in a motion to assume or reject made by the Debtors which is pending before the Bankruptcy Court on the Confirmation Date. No Executory Contracts (including unexpired leases) are being assumed under the Plan and there are no assumption obligations.

#### 2. Bar Date for Rejection Claims

Nothing in the Plan will be deemed to extend any deadline previously set by the Court for filing proofs of Claims, including with regard to contracts and leases heretofore rejected by Court order. If for any reason a prior order of the Court setting a deadline for the filing of proofs of Claims is found to be not applicable to the damages resulting from the rejection of an Executory Contract, such Claim for damages shall nevertheless be forever barred and shall not be enforceable against the Debtors or their Estates unless a proof of Claim is filed with the Bankruptcy Court not later than thirty (30) days after the Effective Date.

#### 3. Objection to Rejection

Any entity which is a party to an Executory Contract to be rejected hereunder shall, no later than ten days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve

upon Debtors' counsel any objection to such rejection setting forth the basis for the objection. Failure to file an objection shall be deemed a consent to rejection.

### G. Conditions Precedent to Effective Date

#### 1. Conditions Precedent to Effective Date

Subject to waiver by the Debtors and the Creditors' Committee, as set forth in Section 12.0111.01 of the Plan, the occurrence of the Effective Date of this Plan is subject to the following conditions precedent:

(a) the Confirmation Order shall have become a Final Order;

(b) all order(s) with respect to all applications for allowance of professional fees shall have been entered and become Final Orders;

(c) the Debtors shall have been substantively consolidated

(d) the Liquidation Trust shall have been executed, the Liquidation Trust shall be vested with all of the property, assets, powers, rights, duties, claims and powerscauses of action of the Debtors, and the Liquidation Trustee shall have been appointed;

(e) funds in the Blackstone Reserve Account shall have been released from escrow;

(f) The Balmat Mine Settlement shall have been approved by Final Order of the Court and the Debtors shall have received the $2.5 million from SLZC;

(g) the Distribution Account shall have been created and funded with sufficient cash to make the Initial Administration Claims Distribution and the Initial Priority Claims Distribution and, following such distributions, shall have a balance of at least $500,000 to fund the fees, costs and expenses to be incurred by the Liquidation Trust; and

(h) all other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of this Plan shall have been executed prior to the Effective Date.

#### 2. Effect of Failure of Conditions Precedent

If the conditions in Section 12.0111.01 of the Plan are not met, the Debtors may (i) withdraw the Plan, or (ii) waive, in whole or in part, with the consent of the Creditors' Committee, any such conditions.

### H.    Effect of Confirmation of the Plan

#### 1.    No Discharge

The Confirmation Order shall not discharge any Debtor from any debt and liability that arose before the Confirmation Date, as provided in section 1141(d)(3)(A) of the Bankruptcy Code.

#### 2.    Vesting of Assets

Except as otherwise expressly provided in the Plan and the Confirmation Order, on the Effective Date, in accordance with section 1141(b) of the Bankruptcy Code, the Liquidation Trust shall be vested with all of the property of the Estates free and clear of all Claims, liens, encumbrances, charges and other interests of Claimants and holders of Equity Interests for the sole purpose of making distributions to Creditors in accordance with the Plan, and succeed to all rightsassets, powers, rights, duties, claims and causes of action of the Debtors.

#### 3.    Legal Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

#### 4.    Term of Injunctions or Stays

Unless expressly modified or lifted by the Court, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, and in existence on the Confirmation Date, shall remain in full force and effect until the earlier of the entry of a final decree or dissolution of the Liquidation Trust.

HF 5829691v.611 #12807/0001

## 5.    Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors which arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind ~~against the Debtors,~~which would interfere in any way with ~~respect to any such Claim or Equity Interest~~any Liquidation Trust Assets, Property of the Estate, or the SPM Settlement Proceeds[7], (b) the enforcement, attachment, collection, or recovery of any Liquidation Trust Assets, Property of the Estate, or the SPM Settlement Proceeds by any manner or means of any judgment, award, decree, or order against the Debtors on account of any such Claim or Equity Interest, and/or (c) creating, perfecting, or enforcing any encumbrance of any kind against the ~~Debtors or against the property or interests in the Estates~~Liquidation Trust Assets, Property of the Estate, or the SPM Settlement Proceeds on account of any such Claim or Equity ~~Interest, (d) asserting, directly or indirectly, any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or against the Estates on account of any such Claim or Equity Interest, and/or (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan with respect to such Claim or~~ Interest.  Such injunction shall extend to successors of the Debtors (including, without limitation, the Liquidation Trust) and their properties and interests in property.  Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages from the willful violator.  However, nothing

---

[7] The injunctions described in this paragraph assume that the SPM Settlement Proceeds are contributed to the Liquidation Trustee on the Effective Date.

HF 5829691v.611 #12807/0001

contained in this section shall prohibit the holder of a timely filed proof of claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidation Trust under the Plan. Furthermore, nothing in this section or any other provision of the Plan, shall be deemed to constitute or result in a discharge of the Debtors under section 1141(a) of the Bankruptcy Code.

**6.** ~~**The Debtors' Release**~~**Clarification of Injunction**

~~On the Effective Date, the Debtors, on behalf of themselves and the Estates,~~ Nothing in the Debtors' bankruptcy cases, Confirmation Order, Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtors' bankruptcy case shall in any way be ~~deemed to release unconditionally all of their~~ construed to discharge, release, limit, or relieve any party other than the Debtors, in any capacity, from any liability or responsibility with respect to the New Jersey Zinc Company, Inc. Employees' Pension Plan (the "Pension Plan") or any other defined benefit pension plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, Confirmation Order, Bankruptcy Code, or any other document filed in any Debtors' bankruptcy cases. For the avoidance of doubt, the PBGC will be paid from the Debtors' estates pursuant to its allowed claims in the case and in accordance with any confirmed chapter 11 plan.

**7.** **Exculpation**

The Debtors, the Liquidation Trust and all of the Debtors' respective officers, directors, employees, advisors, attorneys, financial advisors, accountants and other professionals past and present, each of ~~the~~ Creditors' Committee members, and the Creditors' Committee's counsel, and each of their representatives and agents (including any professionals retained by such

56

Persons or Entities) (individually, a "Released Party" and collectively, the "Released Parties") ~~from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court, and (ii) the Liquidation Trust shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of set-off or recoupment against any claims of any such Persons or Entities asserted against the Debtors~~<u>are exculpated to the full extent of Section 1125(e) of the Bankruptcy Code and all applicable case law interpreting such section</u>.

### ~~7. Exculpation, Release and Injunction of Released Parties~~

~~The Debtors, the Liquidation Trust and the Released Parties (i) shall have no liability whatsoever to any holder or purported holder of a Professional Fee Claim, an Administrative Expense Claim, Priority Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the negotiation of the Plan, the negotiation of any Plan Document, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan or the Disclosure Statement or in furtherance thereof, except for willful misconduct or gross negligence as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and~~

~~responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable laws or rules protecting such Released Parties from liability.~~

### 8. Preservation of Insurance

The Debtors' release from all Claims as provided herein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Liquidation Trust (including, without limitation, its officers and directors), the Distribution Account, the Liquidation Trustee, or any other Person or Entity.

### 9. Indemnification Rights

From and after the Effective Date, the Liquidation Trustee and the members of the Committee, and each of their respective partners, agents, members, employees, attorneys and affiliates (each an "Indemnitee" and, collectively, "Indemnitees"), to the extent that such Indemnitee was or is made a party or is threatened to be made a party to or is involved in any action, suit, adversary proceeding, disputed matter, or other proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that the Indemnitee was a member of the Committee or is or was serving at the request of the Liquidation Trustee in a representative capacity and was authorized to act in such capacity, shall be indemnified and held harmless by the Liquidation Trust to the fullest extent authorized by applicable law against all expenses, liability and loss (including attorneys' fees, judgments, fines, excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such Indemnitee in connection therewith.

HF 5829691v.~~6~~11 #12807/0001

### 10. Immunity

All actions taken before, on or after the Effective Date by the Liquidation Trustee and the Creditors' Committee, or any of their respective members, agents, representatives, attorneys, advisors or accountants, as contemplated under the terms of the Plan, shall be conclusively deemed to be actions within the scope of sections 1103 and 1107 of the Bankruptcy Code, except for willful misconduct or gross negligence, neither the Liquidation Trustee, the Committee, their respective professionals, nor the Creditors' Committee's members shall be determined liable to the Estates or to any other person or party for any action or omission taken or made in connection with the Plan or its effectuation before, on or after the Effective Date, and such parties may in good faith exercise or refrain from exercising any right, power, duty or obligation contemplated thereunder without challenge or recourse. The Bankruptcy Court shall have and retain exclusive jurisdiction over any and all claims asserted against any party with respect to any act or omission taken or made in connection with the Plan or its effectuation at any time.

### I. Retention of Jurisdiction

### 1. Scope of Jurisdiction

Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain and have exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan pursuant to, and for the purpose of sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

    (i)    To hear and determine pending applications for the assumption or rejection of executory contracts pending on the Confirmation Date and the allowance of Claims resulting therefrom;

    (ii)    To hear and determine any and all adversary proceedings, applications, and disputed matters, including any remands of appeals, pending on the Effective Date;

(iii)    To ensure that Distributions to holders of Allowed Claims are accomplished as provided by the Plan;

(iv)    To resolve disputes as to the ownership of any Claim;

(v)    To hear and determine any dispute relating to the liquidation, collection or distribution of Liquidation Trust Assets;

(vi)    To hear and determine any timely objections to or applications concerning Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claims;

(vii)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(viii)    To enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

(ix)    To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(x)    To hear and determine applications for compensation and reimbursement of expenses of Professional Persons under sections 330, 331 and 503(b) of the Bankruptcy Code;

(xi)    To hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(xii)    To hear and determine any issue for which the Plan requires a Final Order of the Court;

(xiii)    To enter and implement orders and to take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, or indemnity obligations contained in the Plan and the Confirmation Order;

(xiv)    To hear and determine motions seeking a compromise, settlement, release, or abandonment of any Claim or cause of action arising on or before the Effective Date by or against the Debtors;

(xv)   To recover all assets of the Debtors and property of the Estates, wherever located;

(xvi)   To adjudicate all causes of action available to the Estates as of the Confirmation Date, including but not limited to finalizing the collection of default judgments related to Avoidance Actions;

(xvii)   To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xviii)   To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(xix)   To enter a final decree closing the Chapter 11 Cases.

## J.   Miscellaneous Provisions

### 1.   Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation of any other lien, mortgage, deed or trust or other security interest; or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with, the Plan or the sale of any assets of the Debtors or the Liquidation Trust, including any deeds, bills of sale or assignments executed in connection with the Plan, or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under section 1146(a) of the Bankruptcy Code.

The Sale entered into by the Debtors during the Bankruptcy Cases and approved by the Court pursuant to the Sale Order was a sale in contemplation of the Plan and, therefore, all such actions taken pursuant to such Sale are entitled to the exemptions provided for under and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code.

Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, transfer tax, intangible tax, recording fee, or similar tax.

### 2. Asset Sales

All assets of the Debtors not previously disposed of (other than claims and causes of action) shall be sold or otherwise liquidated or, if appropriate in the judgment of the Liquidation Trustee, abandoned in any commercially reasonable manner.

### 3. Revocation and Withdrawal of the Plan

The Debtors reserve the right, in the exercise of their reasonable discretion, to revoke and withdraw or to modify the Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date. If the Debtors revoke or withdraw the Plan, (a) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Person in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order was not entered, the Plan was not filed and the Effective Date did not occur.

### 4. Compromise of Controversies

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted,

by or against the Debtors or any of them, arising out of, relating to, or in connection with, the business or affairs of, or transactions with, the Debtors.

Bankruptcy Rule 9019 provides the mechanism for Court approval of compromises and settlements. The Rule provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Settlements and compromises are "a normal part of the process of reorganization..." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Comme'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005). The Supreme Court has recognized that "[i]n administering a reorganization proceeding in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." In re Protective Committee for Independent Stockholders of TMT Ferry, Inc. v Anderson, 390 U.S. 414, 424 (1986). Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").

In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted). The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a

63

proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002). The Bankruptcy Court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Commc'ns, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities'." In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvas the issues' to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia Commc'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3D 600 (2d Cir. 1994).

### (a)  The Balmat Mine Settlement

The Disclosure Statement shall constitute a motion, pursuant to Bankruptcy Rule 9019, for Court approval of the Balmat Mine Settlement. Here, the terms of the Balmat Mine Settlement are fair, reasonable and in the best interests of the Estates. Moreover, the

consummation of the Balmat Mine Settlement is critical to the occurrence of the Effective Date and the implementation of the Plan.

As set forth in Section V(D)(1) hereof, in May 2003, the Debtors entered into a purchase and sale agreement with SLZC (as amended and dated June 10, 2003, the "Agreement") under which it agreed to sell to SLZC real property and attendant other assets comprising a zinc mine located in Balmat, New York. The Agreement obligates SLZC to pay consideration to the Debtors annually 30% of "Net Free Cash Flow" generated by the mine facility. The aggregate amount of annual payments to be made by SLZC are subject to a "Cap" which, due to the occurrence of certain conditions, is now $25,000,000. The definition and calculation of Net Free Cash Flow has proven to be problematic such that even when the Balmat Mine Facility was open and operating (it is currently closed), SLZC's calculations of Net Free Cash Flow resulted in no annual payments to the Debtors. Certain disputes have arisen between the parties regarding SLZC's calculations of "Net Free Cash Flow" and the parties, with the assistance of counsel to the Creditors Committee have, over an extended period of time, engaged in extensive discussions in an attempt to resolve their disputes. As a result of these discussions, an agreement in principle was reached whereby SLCZ will "buy out" its remaining payment obligations under the Agreement and the Debtors will receive a lump sum cash payment of $2.5 million in lieu of the potential receipt of annual payments over several years. The Debtors, Creditors' Committee and SLZC are currently negotiating documentation memorializing the Balmat Settlement Agreement. Once finalized, and prior to the Confirmation Hearing, the Debtors will file a copy of the Balmat Mine Settlement Agreement with the Court. Copies of the Balmat Mine Settlement Agreement may be thereafter obtained upon written request to Justin B. Singer, Esq. at jsinger@herrick.com.

The Debtors and the Creditors' Committee have determined that the Balmat Mine Settlement is beneficial to the Estates in a number of ways. First, although the Debtors are currently entitled to receive up to $25 million in future cash payments from SLZC depending upon future calculations of "Net Free Cash Flow," the Balmat Mine is currently closed and not producing *any* cash flow. Accordingly, there is no guarantee that the Debtors would receive any future cash payments from SLZC absent the Balmat Mine Settlement. Further, even if the Balmat Mine were to be reopened, future payments from SLZC, if any, would not be due for months, if not years, depending on future calculations of "Net Free Cash Flow." Conversely, the $2.5 million payment due under the Balmat Mine Settlement will provide the Debtors with near immediate liquidity which is crucial to the ability of the Liquidation Trustee to make the Distributions required under the Plan. Moreover, although the Debtors and Creditors' Committee have disputed SLZC's prior calculations of "Net Free Cash Flow" during the period that the Balmat Mine was open and operating, there can be no assurance that the Debtors would prevail in any litigation with SLZC regarding those or any future calculations. Therefore, given the clear benefits to the Estates, the Debtors believe that the proposed Balmat Mine Settlement falls well above the "lowest point in the range of reasonableness" required for approval of a settlement under Bankruptcy Rule 9019. The Balmat Mine Settlement, therefore, should be approved.

### (b) Resolution of Blackstone Restructuring Fee

The Debtors also hereby seek Court approval of the Blackstone Fee Resolution. The Blackstone Fee Resolution is also critical to occurrence of the Effective Date and to the implementation of the Plan. Blackstone was retained in these cases to represent the Debtors as their financial advisors in order to assist the Debtors with operational issues and to develop an

66

exit plan from chapter 11. Blackstone was entitled to $150,000 per month for their financial advisory services. Blackstone was also entitled to a bonus Restructuring Fee of $1,000,000 (the "Restructuring Fee") in the event of a "Restructuring." Blackstone filed a Final Application in April 2004, after the Sale, seeking its outstanding monthly fees and the Restructuring Fee. The Debtors and the Committee advised Blackstone that they would object to the payment of any Restructuring Fee to Blackstone unless all other Administration Creditors and Priority Creditors were paid in full.

Following the Sale, certain disputes arose regarding a "carveout" from the secured lenders' collateral to pay professionals retained in these cases. On July 15, 2004, the Court entered an order settling the carveout dispute (the "Carveout Settlement Order") between the Debtors' secured lenders, the Debtors, and the estates' professionals and providing for funding of the Debtors' estates through liquidation of non-core assets. The Carveout Settlement resulted in a prepayment by the Sale purchaser of $2.3 million of a $4.5 million Estate Note received by the Debtors under the Sale, leaving $2.2 million owing on the Estate Note in favor of the Debtors' estates (the "Remaining Estate Note"). Thereafter, on August 9, 2005, the Court entered an order approving a settlement and stipulation pursuant to which the terms of the Remaining Estate Note were refinanced (the "Refinancing"). After accounting for certain offsets pursuant to the Refinancing, the balance of Remaining Estate Note was paid in full to the Debtors' estates.

Pursuant to the Carveout Settlement Order, proceeds of the Estate Note, as well as certain amounts expected to be recovered from the sale of non-core assets and avoidance actions, were to be deposited in an operating account established by Debtors' counsel, for the payment of, *inter alia*, past, current and future professional fees and expenses. However, the Carveout Settlement Order also provided that $800,000 was to be deposited in a separate escrow account (i.e. the

Blackstone Reserve Account) to cover 80% of the Restructuring Fee to be maintained by Debtors' counsel pending final allowance of the Restructuring Fee by the Court. Further, according to the Carveout Settlement Order, in the event the Restructuring Fee was not allowed in part or in full by the Court, the monies in the Blackstone Reserve Account would be distributed pro rata to the estates' professionals on account of unpaid fees and expenses. Counsel to the Debtors and the Creditors Committee have engaged in extensive discussions with Blackstone in order to obtain the release of funds from the Blackstone Reserve Account which funds would be utilized to make Distributions to holders of all Allowed Administrative Expense Claims rather than being specifically earmarked for the payment of Blackstone's Restructuring Fee. As a result of those discussions, Blackstone has agreed to the release of the funds from the Blackstone Reserve Account. The release of those funds provides the liquidity necessary to make the Distributions contemplated under the Plan. In light of Blackstone's agreement to release the funds held in the Blackstone Reserve Account, the Debtors and Committee have agreed not to object to Blackstone's request for allowance of the Restructuring Fee.

### 4. ~~5.~~ The Creditors' Committee

The Creditors' Committee shall dissolve on Substantial Consummation.

### 5. ~~6.~~ Exhibits

All exhibits attached to the Plan are, by this reference, hereby incorporated into the Plan.

### 6. ~~7.~~ Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall insure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

HF 5829691v.611 #12807/0001

### 7. 8. Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the Liquidation Trustee.

### 8. 9. Amendment or Modification of the Plan

The Plan may be altered, amended or modified prior to the entry of the Confirmation Order as provided in section 1127 of the Bankruptcy Code. A holder of a Claim that has accepted the Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of a Claim of such holder.

### 9. 10. Post-Confirmation Immaterial Modifications

The Debtors, with the consent of the Committee or the Liquidation Trustee and without the approval of the Bankruptcy Court, and without notice to all holders of Claims and Interests, insofar as it does not materially adversely affect the interest of holders of Claims and Interests, may correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite the execution of the Plan.

### 10. 11. Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall with the consent of the Debtors or the Liquidation Trustee have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any

such holding, alteration or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.** ~~12.~~ **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof) will govern the construction and implementation of this Plan and any agreements, documents and instruments in connection with the Plan.

**12.** ~~13.~~ **Notices**

All notices to the Debtors and all requests or demands for payments shall be in writing and shall be deemed to have been given when personally delivered by hand or deposited in any depository under the control of the United States Postal Service or when received by courier or facsimile transmission. Notices shall be sent or delivered to:

> HH Liquidating Corp. f/k/a
> Horsehead Industries, Inc.
> c/o Herrick Feinstein, LLP
>
> 2 Park Avenue
> New York, NY 10016
> Tel. No. (212) 592-1400
> Fax No. (212) 752-8000
> Attn: Joshua J. Angel, Esq.
>
>    -and-
>
> Blank Rome LLP
> 405 Lexington Avenue
> New York, NY 10174
> Tel. No. (212) 885-5000

Fax No.  (212) 885-5002
Attn: Michael Z.  Brownstein, Esq.

or to any other address hereinafter designated by Debtors, the Creditors' Committee or the Liquidation Trustee to interested parties.

### **13.** ~~14.~~ Reservation of Rights

Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by any party in interest of any action with respect to the Plan, shall (a) be or be deemed to be an admission against interest, and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in any of the assets of any other party in interest, and until the Effective Date, all such rights are specifically reserved.  In the event that the Plan is not confirmed or fails to become effective, neither the Plan nor the Disclosure Statement nor any statement contained in the Plan or in the Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

### **14.** ~~15.~~ Closing of the Chapter 11 Cases

When all Disputed Claims filed against Debtors have become Allowed Claims or have been disallowed by Final Order, and all remaining assets of Debtors have been liquidated and converted into Cash (other than those assets abandoned by Debtors), and such Cash has been distributed in accordance with the Plan, or at such earlier time as Debtors deem appropriate, the Liquidation Trustee shall seek authority from the Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 15. ~~16.~~ Post-Confirmation Date Service List

From and after the Confirmation Date, all notices of appearance and demands for service of process filed with the Court prior to such date shall no longer be effective. No further notices, other than notice of entry of the Confirmation Order shall be required to be sent to such Entities.

### 16. ~~17.~~ Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors will file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## VII.
## CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Class 2 of the Plan are impaired and the holders of Allowed Claims in Class 2 are entitled to vote to accept or reject the Plan. Claims in Class 1 are unimpaired. The holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes therefore is not required under section 1126(f) of the Bankruptcy Code. Holders of Claims in Class 3 are impaired and are deemed to reject the Plan. Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of Impaired Claims against, and Impaired Interests in, the Debtors that are entitled to vote must accept the Plan.

An Impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the

HF 5829691v.~~6~~11 #12807/0001

Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code or any insider.

A vote may be disregarded if the Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Code.

Any creditor in an impaired Class (i) whose Claim has been listed by the Debtors in the Debtors' Schedules filed with the Court (provided that such Claim has not been scheduled as Disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date (or, if not filed by such date, any proof of Claim filed within any other applicable period of limitations or with leave of the Court), which Claim is not the subject of an objection or request for estimation, is entitled to vote.

### B.      The Confirmation Hearing

The Bankruptcy Code requires the Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for [ ],August 31, 2010 at [ ]10:00 a.m. Eastern Standard Time, before the Honorable Stuart M. Bernstein, at the Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, NY 10004-1408.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interests of the Debtors held by the objector.  Any such objection must be filed with the Court and served so that it is received by the Court and the following parties on or before [ ]August 24, 2010 at 54:00 p.m. Eastern Standard Time:

Herrick, Feinstein LLP
Attorneys for the Debtors
2 Park Avenue
New York, New York 10016
Attn: Frederick E. Schmidt, Esq.

-and-

Blank Rome LLP
Attorneys for the Official Committee of Unsecured Creditors
405 Lexington Avenue
New York, NY 10174
Attn: Michael Z. Brownstein, Esq.

-and-

Paul Kenan Schwartzberg, Esq.
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

## C.    Confirmation

At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the Plan.

### 1.    Acceptance

Classes 2 and 3 are impaired under the Plan. Class 1 is unimpaired and, therefore, is conclusively presumed to have voted to accept the Plan. Class 3 is presumed to have rejected the Plan.

HF 5829691v.611 #12807/0001

### 2. Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder, and the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

### 3. Best Interests Test

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims and Equity Interests of each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.

HF 5829691v.611 #12807/0001

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and Executory Contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during these Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition Claims. Further, if the Chapter 11 Cases are converted to Chapter 7 or dismissed, it is possible that the SPM Settlement Proceeds would be diluted to fund expenses associated with, among other things, objections to claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in these Chapter 11 cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (ii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in these Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of

an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7. The Debtors also believe that the value of any Distributions to each Class of Allowed Claims would be less than under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative plan of reorganization.

### A.    Liquidation Under Chapter 7

If no plan is confirmed, these Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be selected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7. The Debtors believe that liquidation under chapter 7 would result in substantial delay in the making of distributions to holders of Claims and smaller distributions than those provided for in the Plan because additional administrative expenses would be involved in the appointment of a trustee, and a trustee would be subject to a steep "learning curve" in these cases.

### B.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could, in theory, attempt to formulate a different plan. However, the Debtors do not believe that any other confirmable plan would be proposed.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH

BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. Certain Bankruptcy Law Considerations

#### 1. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

#### 2. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

### B. Certain Tax Matters

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtors, see Article X of this Disclosure Statement, "Certain Federal Income Tax Consequences Of The Plan."

HF 5829691v.611 #12807/0001

C.    **Additional Factors to be Considered**

1.    **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    **No Representations Outside This Disclosure Settlement Are Authorized**

No representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    **Claims Could Be More Than Projected**

Although the Bar Date for filing proofs of Claim occurred on March 28, 2003, the Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.

4.    **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be

considered assurance or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 5. No Legal or Tax Advice is Provided to You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 6. No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

## X.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to creditors, Equity Interest holders and to the Debtors.  It does not address the federal income tax consequences to holders whose Priority Claims are paid in full in Cash under the Plan.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") in effect on the date hereof.  Changes in, or new interpretations of, such rules may have

retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayer (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations and investors in pass-through entities).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN AND NOT TO RELY EXCLUSIVELY ON THIS SUMMARY. THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CLAIM HOLDER, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

### A. Federal Income Tax Consequences to Creditors

If a Claim is not a "security" for federal income tax purposes, then an exchange relating to such Claim would constitute a taxable exchange in which the holder of such Claim would generally recognize gain or loss in an amount equal to the difference between (a) the "amount realized," *i.e.*, the amount of cash and the aggregate fair market value of all property received by such holder in exchange for such Claim (other than a Claim for interest), and (b) such holder's adjusted basis in such Claim (exclusive of any basis attributable to accrued interest). The character of any such gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder of such Claim, whether such Claim constitutes a capital asset in the hands of such holder, whether such Claim has been held for more than twelve months, whether such Claim was purchased at a discount and whether and to what extent such holder has previously claimed a bad debt deduction in respect of such Claim. A holder's tax basis in any New Common Stock or other property received in a taxable exchange will be the fair market value thereof included in the holder's amount realized on the exchange. The holding period for the property so received will begin on the day following the exchange.

### B. Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Indebtedness

The Debtors in this case are being liquidated with all of their assets being transferred to the Liquidation Trust on the Effective Date. Under normal circumstances and under general tax provisions, the Debtors would realize cancellation of debt ("COD") income to the extent that the Debtors pay a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtors that is worth less than the amount of such Claim. For this purpose, the amount of consideration paid to a creditor generally would equal the amount of cash and the fair

82

market value on the Effective Date of any other property paid to such creditor. Because the Debtors will be in a bankruptcy case at the time the COD income is realized, the Debtors will not be required to include COD income in their gross income, but rather must reduce certain of their tax attributes by the amount of COD income that would have otherwise been required to be recognized. Under the general rules of Tax Code Section 108, the attribute reduction would be applied first to reduce the Debtors' NOL carryforwards to the extent of such NOLs, with any excess excluded COD income applied to reduce certain other tax attributes. The Debtors' tax attributes are reduced only after the Debtors' tax liability for the current year is determined (with the Debtors' current-year loss being reduced before any carryforwards from prior years). Tax Code Section 108(b)(5) provides an election pursuant to which the Debtors can elect to apply the required attribute reduction to first reduce the basis of its depreciable property to the extent of such basis as of the beginning of the taxable year following the taxable year in which the discharge occurs, and then to reduce their NOLs followed by certain of their other attributes.

### 2. Net Operating Losses of Debtors

Not applicable.

### 3. Alternative Minimum Tax

Not applicable.

### C. Additional Federal Income Tax Considerations for All Claim Holders

### 1. Distributions in Discharge of Accrued Interest

A Claim holder that receives money or other property in discharge of a Claim for interest accrued during the period the holder owned such Claim and not previously included in such holder's income will be required to recognize ordinary income equal to the amount of such money and the fair market value of such property received in respect of such Claim. A holder generally may claim an ordinary deduction (or, possibly, a write-off against a reserve for bad

debts) to the extent of any Claim for accrued interest that was previously included in such holder's taxable income and which will not be paid in full by the Debtors under the Plan (after allocating any payment to be made by the Debtors between principal and accrued interest), even if the underlying Claim is held as a capital asset. The tax basis of any property received in exchange for a Claim for accrued interest under the Plan will equal the fair market value of such property on the Effective Date, and the holding period for such property will begin on the day following the Effective Date.

The extent to which consideration distributable under the Plan is allocable to interest is unknown. Holders of Claims are advised to consult their own tax advisers to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

**THE FOREGOING FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. HOWEVER, THE APPLICATION OF THE RULES DESCRIBED ABOVE TO THE SITUATION OF ANY PARTICULAR HOLDER OF A CLAIM IS COMPLEX. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THEM.**

## XI.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all eligible holders of Impaired Claims and Interests to vote to **accept** the Plan, and to complete and return their ballots so that they will be **received** by the Balloting Agent on

84

or before 5:00 p.m. (Eastern Time) on [ ], 2010.  Furthermore, the Creditors Committee supports

the Plan and believes that the Plan is the best available alternative to creditors under the

circumstances.


Dated:  June 9, 2010

                                        Respectfully Submitted,

                                        HH LIQUIDATING CORP. f/k/a
                                        HORSEHEAD INDUSTRIES, INC.


                                        By: /s/ Ronald J. Statile
                                        Title: Chief Liquidation Officer

                                        ZCA LIQUIDATING CORP. f/k/a
                                        ZCA MINES, INC.


                                        By: /s/ Ronald J. Statile
                                        Title: Chief Liquidation Officer

                                        HRD LIQUIDATING CORP. f/k/a
                                        HORSEHEAD RESOURCE DEVELOPMENT
                                        COMPANY, INC.


                                        By: /s/ Ronald J. Statile
                                        Title: Chief Liquidation Officer


                                        SRM LIQUIDATING CORP. f/k/a
                                        STONEY RIDGE MATERIALS, INC.


                                        By: /s/ Ronald J. Statile
                                        Title: Chief Liquidation Officer

HF 5829691v.611 #12807/0001

Document comparison by Workshare Professional on Monday, June 28, 2010 10:29:54 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://HFDMS/HF/5829691/6 |
| Description | #5829691v6<HF> - DISCLOSURE STATEMENT (5-14-10) |
| Document 2 ID | interwovenSite://HFDMS/HF/5829691/11 |
| Description | #5829691v11<HF> - DISCLOSURE STATEMENT (5-14-10) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 266 |
| Deletions | 272 |
| Moved from | 16 |
| Moved to | 16 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 570 |